## WARREN v. UNITED STATES.

### (Circuit Court of Appeals, First Circuit. November 8, 1893.)

#### No. 35.

IMMIGRATION—DETENTION AND RETURN OF UNLAWFUL PASSENGERS — DUTY OF VESSEL'S OFFICERS.

Under section 10 of the immigration act of 1891, (26 Stat. 1086,) the agent of a vessel, who is ordered to detain on board and return certain immigrants unlawfully brought to this country, is bound to so detain them at all hazards, and will only be relieved therefrom by vis major, or inevitable accident. The word "neglect" in the provision for a penalty in case of "neglect to detain" is used in the popular sense of "fail" or "omit."

In Error to the Circuit Court of the United States for the District of Massachusetts.

At Law. Indictment of Frederick Warren for violation of the immigration law of March 3, 1891. Defendant was convicted in the court below, and brings the case here on writ of error. Affirmed.

Benjamin L. M. Tower, (Joshua D. Ball, on the brief,) for plaintiff in error.

Frank D. Allen, U. S. Atty., (Henry A. Wyman, Asst. U. S. Atty., on the brief.)

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. This case arises on the rulings of the circuit court at the trial of an indictment under section 10 of the act of March 3, 1891, (26 Stat. 1086.) The plaintiff in error admitted that certain aliens, who are named in the indictment, embarked for the United States from a foreign port upon a certain vessel called the Kansas, and did therefore unlawfully come to the United States upon and by means of said vessel; that upon their arrival he was the agent of said vessel at Boston, and was then and there duly notified, in accordance with the laws of the United States, by the superintendent of immigration, that the said aliens, naming each, were then and there likely to become a public charge in the said United States, and were not then and there entitled, under the laws of the United States, to be admitted into the said United States; that the said Warren was then and there, as agent of the said vessel, by the superintendent of immigration, duly notified and ordered to

detain the said, aliens, who, in this notice and order, were respectively named, and to immediately return them, and each of them, upon the same vessel, to the foreign port or ports from which they had come to the United States. He also admitted that he did not in fact detain on board the same vessel, the Kansas, the aliens named in the indictment, and did not in fact return them to the port from which they came, but that they escaped from said vessel. No objection was made to the sufficiency of the indictment.

At the trial, after making the aforesaid admissions, the defendant offered evidence to prove that there was no negligence or neglect in detaining the said aliens, and that they escaped without any negligence or neglect on his part. This evidence was excluded as immaterial, to which ruling the exception of the defendant was duly taken and allowed. The court further ruled that the defendant was bound at his peril, and at all hazards, to detain the aliens on board the said vessel, and that nothing would relieve him of his obligation to do so, except vis major or inevitable accident. To this ruling also exception was allowed. The defendant did not pretend that the escape was through inevitable accident or vis major.

The correctness of these rulings is now the only matter for consideration, and it is evident, if the ruling that nothing short of vis major or inevitable accident would relieve from the duty to detain and return the aliens, the evidence offered, of the absence of neglect or negligence, was immaterial, and was properly excluded. So this case in fact presents only a single question: Was the ruling as to the duty of the defendant right? For the determination of this question it becomes necessary to examine the whole of chapter 551 of the Statutes of 1891, on the tenth section of which the indictment is based. Such examination clearly shows that the aim and purpose of the act, and the inflexible intention of congress, were to protect the health, the morals, and the safety of the people of this country by the absolute exclusion of immigrants who might endanger the welfare of the community in any of these respects. The first section specifically enumerates the classes of aliens to be excluded, and among those specified are "persons likely to become a public charge." Section 2 forbids the settlement, compromise, or discontinuance of proceedings for violation of another act relating to the importation and migration of foreigners under labor contracts. Section 3 relates to advertisements printed or published in foreign countries for the assistance or encouragement of immigration. Section 4 denounces penalties against owners of vessels who shall solicit, invite, or encourage the immigration of any alien into the United States. Section 5 is merely amendatory of the act of February 26, 1885. Section 6 makes subject to a fine of $1,000, or imprisonment not exceeding one year, or both, any person who shall bring into or land in the United States, or who shall aid in so doing, any person not lawfully entitled to enter the United States. Section 7 provides for the appointment of a superintendent of immigration, and makes him an officer in the treasury department, under the control and supervision of the secretary of the treasury. Section 8 provides that upon the arrival by water of alien immi-

grants it shall be the duty of the master or agent of the vessel bringing them to make report to the proper inspection officers of the name, nationality, and last residence of every such alien before any of them are landed. The inspection officers are thereupon required to inspect all such aliens, either on board the vessel in which they have arrived, or at some definite time and place to which by the order of said officers they have been removed. The decision of the inspection officers adverse to the right of any alien to land is made final unless appeal be taken to the superintendent of immigration, whose action may be reviewed by the secretary of the treasury. This section also makes it the duty of the commanding officer of the vessel in which such alien immigrants came to the United States "to adopt due precautions to prevent the landing of any alien immigrant at any place or time other than that designated by the inspection officers," and declares that "any such officer or agent or person in charge of such vessel who shall either knowingly or negligently land or permit to land any alien immigrant at any place or time other than that designated by the inspection officers, shall be deemed guilty of a misdemeanor, and punished by fine or imprisonment or both." Section 9 extends jurisdiction of state officers over immigrant stations, for the preservation of the peace, and arrest of persons violating state laws.

This brings us to the tenth section, under which this prosecution is begun. It is unquestionable from the preceding sections that the intention of congress was the absolute exclusion from this country of all immigrants of the classes named in the act. Owners, officers, and agents of steam and sailing vessels coming from foreign ports with alien passengers, were fully and plainly warned and notified not to bring such prohibited persons. To guard against all possibility of such persons gaining admittance, duties were imposed on the owners and agents and officers of the vessels to make special report of alien passengers, to retain them on board, or only to land them at designated places, for the sole purpose of inspection, until they had been thoroughly inspected. For willful or negligent violation of those provisions of the act penalties were imposed. Congress, in the tenth section, dealt with the disposal of immigrants found on inspection to belong to the prohibited class, and brought to the United States in contravention of the previous sections; and it is to be noted that removal from the vessel to places on shore for convenience of inspection it is expressly declared "shall not be considered a landing during the pendency of such examination." The tenth section directs that all rejected persons shall, if practicable, be immediately sent back on the vessel by which they were brought in. The condition of practicability is simply a recognition of the contingency that the vessel might not be about to return to the port or country whence she had come. She might be bound to some other place, or she might be detained a long time for necessary repairs, or might be condemned as unseaworthy, or for other sufficient reasons would not be available for the reconveyance of the unlawful comers into the United States; but in every such case the immigrants were to be detained at the expense of the owners of the

vessel on which they came. They are regarded and treated as if still passengers under the care and control of the vessel's owners. Furthermore, if the master, agent, consignee, or owner of the vessel shall refuse to receive back on board the vessel such aliens, or shall neglect to detain them thereon, or shall refuse or neglect to return them to the port from which they came, or to pay the cost of their maintenance while on land, he shall be deemed guilty of a misdemeanor, and be punished. The duty to receive back on board arises either when there has been a wrongful landing, or a removal to an appointed place for inspection. Detaining on board is required when the inspection has been had without any removal from the vessel, as well as when the alien, having been off the vessel, is sent back; and the obligation to return always exists. To secure payment of fines imposed, the clearance of the vessel is refused till they are paid.

We cannot doubt, after thus examining the statute, that the tenth section imposes on masters, owners, agents, and consignees absolutely the duty to do the things required of them respectively. It admits of no excuse. They must at their peril conform to the provisions of the statute. They took the risk, when they brought the alien from a foreign port, that he would be adjudged not lawfully suitable to be admitted here, and must be taken back. The statute is analogous to acts regarding the sale of unwholesome or diseased provisions, or the keeping and storage of dangerous explosives, or the sale of intoxicating spirits. The safety and protection of the public is the end sought. Upon every one rests the duty to see to it that no act or omission of his shall endanger that safety; and, if he fails of the full performance of that duty, good intention, or the absence of evil intention, will not excuse him. The responsibility may be regarded similar to that resting upon a sheriff in case of an escape. He cannot excuse himself by showing that he had exercised care to keep his prisoner. Notwithstanding this view of the aims and purpose of the statute, if it cannot without violence be construed so as to effect its intention, it will be found a case where the legislature, by inadequate or inconsistent expression, has fallen short of its design. And in support of the contention that this is such a case, stress is laid on the expression "neglect to detain;" but we have no doubt that, in view of the general purposes of the statute, the word "neglect" must here receive a common and popular signification, as the equivalent of "fail" or "omit." The employment of the term "neglect" in this sense is neither infrequent nor unfamiliar, and assigning to it here any more restricted or narrow definition would defeat the whole end of the statute,—a result to be tolerated only when necessary. It follows, therefore, that the rulings of the court below were correct, and the judgment must be affirmed.

Judgment of the circuit court affirmed.