No. 31,642

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff*, v. J. A. JACKSON, Sheriff of Johnson County, *Defendant.*

(33 P. 2d 118.)

Opinion filed June 9, 1934.

*Roland Boynton,* attorney-general, and *Dunkin Kimble,* assistant attorney-general, for the plaintiff.

*Charles C. Hoge, John L. Kirkpatrick,* both of Olathe, *Frank M. Sheridan* and *Bernard L. Sheridan,* both of Paola, for the defendant.

The opinion of the court was delivered by

HARVEY, J.: This is an action in quo warranto to remove the sheriff of Johnson county for willful misconduct in office. Generally speaking, the petition alleged three grounds for removal: (1) That on July 4, 1933, defendant appeared in an intoxicated condition upon the public streets in Merriam, in that county; (2) that he withheld payment to the proper officer of certain moneys which had come into his hands by virtue of his office; and (3) that he had assaulted and beaten certain prisoners in his custody for the purpose of securing from them confessions of guilt.

Soon after the action was brought plaintiff filed a motion that defendant be suspended from performing the duties of his office pending the final determination of the action. Due notice was

given, and a hearing was had on the motion. At this hearing plaintiff produced evidence, by affidavits, in support of each of the grounds for removal, and defendant produced evidence, by affidavits, in opposition to the first and second grounds of removal, and as to the third ground stated evidence in opposition would be offered at the final hearing. Respecting the first ground of removal the evidence produced so preponderated in favor of defendant that the court ordered it to be quashed. As to the second ground, the court found the evidence insufficient to justify suspension. As to the third ground, the court found:

"The evidence of misconduct is that the sheriff brutally administered the 'third degree' to prisoners in his custody, and that the undersheriff and deputy sheriff participated in the misconduct. The sheriff, the undersheriff, and the deputy sheriff know what occurred, and the fact of misconduct is not denied or explained."

On this finding an order was made suspending defendant from office pending the final determination of the action. The parties were unable to agree upon the facts pertaining to the second and third grounds for removal, and this court appointed Hon. William R. Smith, formerly a member of this court, to hear the evidence and make and report to the court findings of fact and conclusions of law. This has been done, appropriate exceptions have been taken thereto, and the action has been presented for final determination.

Respecting the second ground for removal, the evidence disclosed that defendant was serving his second term as sheriff; that during his first term, from early in January, 1931, to January 8, 1933, he had not kept a proper record of fees received and had not turned them into the county treasury quarterly, as required by R. S. 28-123; that near the close of his term of office he requested the county commissioners to have an audit made of moneys he had received from two justices of the peace in Olathe. The commissioners agreed to do that, but the auditor was then busy auditing the accounts of other county officers and died before he reached the work of auditing the sheriff's accounts. In March, 1933, the commissioners named another person to audit the sheriff's accounts relating to moneys received from the two justices of the peace. This auditor made his report April 8, 1933, showing an amount due from the sheriff for fees received from the two justices of the peace in the sum of $419.90. Soon thereafter defendant paid the amount to the county treasurer. While derelictions in a previous term ordi-

narily are not grounds for removal from office (*State, ex rel., v. Henschel,* 103 Kan. 511, 175 Pac. 393), we wish to make it clear that we do not approve or condone this conduct. The statute (R. S. 28-123) requires the sheriff and other named county officers to "keep a book to be called 'fee book' " and to "keep a true and accurate account of all fees by them charged and collected," and to report the same to the board of county commissioners quarterly and pay the amount collected to the county, and if he fails to do so that he shall forfeit to the county $10 for each day of such failure, and "if such failure continue for fifteen days he shall forfeit his office." Defendant made no serious attempt to comply with this statute. His excuses were that there was a lack of harmony between his office and that of the clerk of the district court; that one of the justices of the peace had become aggrieved at him; that frequently he was busy and did not have time to make his record; and that he had requested an audit and it was delayed in being made. None of these excuses has any merit. They did not prevent him from performing his duty. This statute was enacted to be complied with, not to be neglected for trivial reasons. His conduct in this matter and the explanations given for it go far to counteract testimony offered on his behalf to the effect that he was an excellent official.

The third ground of removal charged specifically that on or about the night of June 27, 1933, defendant assaulted and beat two prisoners, Howard Crust and Herbert Rose, then in his custody, for the purpose of securing confessions from them. The evidence respecting this tended to show that during defendant's first term of office as sheriff he had assaulted and beaten six prisoners in his custody, one of them severely, and succeeded in getting confessions from all of them but one. Respecting these instances defendant admitted striking one of those prisoners in the face with his fist and breaking his nose, and slapping another, and denied mistreatment of the other four. As to two of these, the denial seemed to be well founded, but not as to the other two. We shall not go into the details of these instances further than to say that his explanation of the circumstances under which he struck the two prisoners does not show justification for such conduct. Defendant objected to evidence respecting transactions within his first term of office on the ground they would not constitute grounds for removal. For the purposes of this case that may be conceded to be true, on the authority of *State, ex rel., v. Henschel,* supra. The testimony, however, was competent as tending

to show defendant's habit, custom, and his method and manner of treating prisoners in his custody.

With respect to the alleged mistreatment of Howard Crust the evidence was substantially as follows: On June 27, 1933, shortly after noon, Ed Coffeen, sheriff of Linn county, and his deputy, and J. E. Gay, undersheriff of Johnson county, and a highway patrolman, arrested Howard Crust and Herbert Rose, young men reared on farms near Stanley, and two other young men, without warrants, but on information which led them to believe they were connected with the larceny of typewriters from the high school at La Cygne, in Linn county. Crust and Rose were taken to the Jackson county jail at Olathe. The other two were taken to the Linn county jail. That evening, about ten o'clock, on defendant's instruction, his undersheriff, Gay, and deputy, Joe Hines, took Howard Crust from the jail to the sheriff's office in the courthouse for questioning. There were present Howard Crust, about twenty-two years of age, tall and slender, who weighed about 140 pounds, the defendant, sheriff Jackson, his undersheriff, Gay, his deputy sheriff, Hines, and F. E. Bailey, special agent for the Frisco railroad. All of the officers were armed. They were robust, active men; Hines weighed 225 pounds. Respecting what took place Crust testified:

"I was . . . questioned with regard to my connection with the crime of stealing typewriters in Linn county from the La Cygne high school, and with regard to stealing some veterinary tools in Johnson county. While in the sheriff's office in the courthouse I was whipped to get a confession. He kept asking questions about all kinds of things, and finally led up to beating me around. He kicked me and hit me in the face or eye and beat me across the stomach with a rubber hose. There were present Joe Hines, a deputy, and a railroad man detective, and Eddie Gay. Gay was undersheriff. All of these individuals took part in striking me. All did a little bit of it. Sheriff Jackson struck me the first time. He hit me with his fists, struck me on the head. Joe Hines, deputy sheriff, hit me with his fist. I was sitting in a chair, my hands in my lap. After asking me a lot of questions Sheriff Jackson walked over in front of me and struck me. He wanted me to confess to a lot of stuff I hadn't done. This was after I had confessed to the theft of the typewriters. After Jackson hit me the first time he kept on asking questions, and every once in a while would hit me. There were all kinds of charges he was trying to make me confess to. I was sitting in a chair and Hines was standing at my right side. Sheriff Jackson was in front and on my left side part of the time. The others were standing up part of the time. I was in the chair as much as possible. Part of the time I was knocked onto the floor. Sheriff Jackson knocked me out once. Joe Hines knocked me out a couple of times. One time I was grabbed by the hair and put back in the chair. Don't know who did this. I was struck with a rubber hose while sitting down. Don't know

who made that assault. My nose was bleeding and my eye was swollen up. These officers called me a son-of-a-bitch a lot of times. I confessed to stealing the typewriters in Linn county. I denied stealing dairy tools from the farm of Doctor Parker. Later on I did confess to stealing these dairy tools, and told the sheriff where they were. Later I was taken over to Kansas City, Kan., by Undersheriffs Hines and Gay. Undersheriff Joe Hines was one of them. I didn't tell the officers at Kansas City that I had been beaten by the officers of Johnson county; they could see that. I didn't think making complaint to them would do any good. After this assault on June 27th there was a bruised place on my stomach, with one eye blacked. I entered the plea of guilty to the charge of grand larceny and was sentenced to the Reformatory at Hutchinson, where I am now confined. After this assault on me in the sheriff's office at Olathe, I was given medical treatment by Doctor Albaugh of Olathe, Doctor Neal of Stanley and Doctor Perkins of Kansas City. Doctor Neal was an osteopath or chiropractor."

As a result of these confessions he was charged with the larceny of the dairy tools in Johnson county. On July 1 he gave bond and was released from jail. On July 2 he consulted Doctor Albaugh, a reputable physician in general practice at Olathe, who examined him. His affidavit filed in this court states:

"I found that both eyes were what is commonly known as blacked—technically known as hæmatosis of both lids. The vessels of the right cornea were ruptured to the extent that the entire so-called whites of the eyes, or cornea, were a solid red mass. The vessels of the right eye were slightly ruptured. On his right side in the back, the lower ribs showed signs of a severe contusion. A scab over the right shoulder showed a healing injury to that point of the body. The left leg was bruised and swollen at and below the knee."

Before our commissioner, after referring to his notes, he testified:

". . . he had some contusions of both eyes. The right eye, the conjunctiva, and the cornea was injected from a rupture of several small blood vessels. The left eye was somewhat reddened, not so much, and a contusion of the outer canthus. He had a little contusion on the right side of the lower ribs. A small contusion over the right shoulder. His left leg was bruised and swollen somewhat below the knee. . . . I don't remember of seeing any injuries to his stomach. The right eye was what you would call bloodshot— extremely bloodshot. The left eye was not so much so, a little bloodshot."

He gave him no treatment for these injuries. On the next day he was examined by Dr. Roy S. Neal, a chiropractor of Stanley, near his home. He testified that he first observed—

"The condition of his right eye, which was badly bloodshot and swollen in the temporal region. . . . Through the temple bone, down through the lateral side of the eye socket. . . . More so than on the left side. Very tender on palpation. . . . I made an examination of the cervical bones of the neck and found them badly subluxated. . . . And examined him both

from the back and the front down the spine clear to the sternum, and found the dorsal vertebra badly subluxated. . . . The nerves emitting from them were very tender and sensitive. . . . I refused to accept the case because of his physical condition, mainly because of the eye. . . . I felt it was a case for an eye specialist. . . . I advised his going to Kansas City to see a specialist."

Several other witnesses, some of whom were relatives, others were not, saw him while he was still in jail, or within a few days after, and testified to his injuries substantially as the physicians did. At least one of them testified that on Crust's stomach was a bruised patch as large as his two hands. On July 3, or 5, the sheriff of Linn county, having procured a warrant for Crust for the larceny of type-writers in that county, took him under that warrant to the county seat, where, on July 20, he entered a plea of guilty and was sentenced to the reformatory. At the time of his sentence his right eye was still bloodshot. With reference to this matter defendant testified:

"I talked with Crust about the school robbery first, and he professed to know nothing about it. Afterwards he told me what he had done with the typewriters. How they had disposed of them, etc. He stubbornly denied having anything to do with the robbery at the Parker farm. I said to him, 'Howard, you have admitted to these three gentlemen here that you committed the burglary. You have admitted you are a thief. Do you want Mr. Parker, whom you say you regard highly, to know that you have these tools in your possession and will not give them up?' I called him a damn fool for being so stubborn. He then said 'you son-of-a-bitch, no son-of-a-bitch can call me that and get away with it,' and came up with both of his fists. He didn't come up standing up straight. He didn't have a chance to. I slapped him on the face. One deputy was at my back. He could not have seen it if he wanted to. The other two were at the far corner of the room. I was not scared. I could not tell you whether I was afraid of personal violence. All of us were armed. While we were in my office in the courthouse with Crust and Rose, I took off my revolver and laid it on the desk or table. I didn't like the gesture of the man getting up. I did not know what his intentions were. The prisoner in this case did not reach for his gun. He didn't get that far. I slapped him before he got that far. He didn't tell me what he was going to do. I reached out as he got up. After I sat down he sat back in the chair and made no further gesture, and I asked him if he was not ready and if he did not think he owed it to Mr. Parker if not to me to tell me where the tools were. He went ahead and said they were out at his father's farm. At that time he did not say anything about losing his temper. He did immediately after he told me where the tools were. After telling me that the tools would be found in the straw stack, I procured a search warrant and sent deputies out there and got the tools. After I got this part of the job done I relaxed and asked Mr. Gay and Mr. Hines to talk to Crust about a school-house job at Spring Hill. My cigarettes were out in an inner office and I

went out to get them. I came back about the time that deputy sheriff Hines slapped this Mr. Crust. Crust wasn't reaching out at that time. He started to get up in the identical manner or nearly so as he had with me. Hines slapped him on the side of the face. He was not beaten with the hose."

J. E. Gay, undersheriff, and F. E. Bailey, special agent of the Frisco railroad, who were present, both testified defendant struck Crust with his fist. Gay also testified that defendant was in no danger. He was there to protect defendant if there had been any necessity for it. All four of them testified that when Joe Hines was talking to Crust about the robbery of the schoolhouse in Johnson county that one time Crust started to rise out of his chair and Hines slapped him and knocked him back in his seat. All four denied that he had been otherwise attacked or mistreated. Bailey was there to inquire about larceny of railroad property. It is clear he took no part in the mistreatment of Crust. After reviewing this evidence more in detail than is given here our commissioner made this finding, which we approve:

"It is beyond belief that these cruel wounds could have been inflicted by one or two slaps on Crust's face with the open hand, and not with the fist. The condition of Crust's face two or three days after his injury, as described by two reputable, disinterested physicians and others, compels the conclusion that Bailey and Deputy Sheriff Gay, who were present, spoke the truth when they testified that they saw Sheriff Jackson strike the prisoner and knock him back in the chair with his fists. It is very clear from the evidence that the purpose of these assaults by the sheriff on Howard Crust were made for the purpose of obtaining a confession from him."

With respect to the alleged mistreatment of Herbert Rose, the evidence is substantially as follows: Shortly after eight o'clock in the evening of June 27 defendant sent for Rose and had him brought to his office at the courthouse. The same persons were there as when Crust was questioned. Rose was asked about the larceny of the typewriters from the high school at La Cygne, and at first was not inclined to talk. Defendant told him that some of the other boys, naming those who had been arrested the same day, had told about the larceny and of his connection with it. Rose then admitted that he went with the other boys and took the typewriters. He was questioned about other offenses and disclaimed any knowledge of them, and it is not shown from any other source that he was connected with any other offense. He testified that during the questioning defendant slapped him several times, caused his nose to bleed and slightly discolored one eye; that blood got

on his shirt, and before he was sent back to the jail after being questioned, perhaps an hour or an hour and a half, defendant had him wash his shirt in the wash room at the courthouse. His sister and a girl with whom he was keeping company, who saw him at the jail a few days later, testified that his eye was slightly discolored and that there was blood or bloodstains on his shirt and overalls. No other witness testified to his mistreatment or injury. Defendant and those with him at the time testified that he was not slapped or otherwise mistreated; that he had no blood on his clothes, and did not wash his shirt before being taken back to jail. We realize some prisoners are likely to make false or exaggerated claims of ill treatment at the hands of peace officers, and that their testimony ordinarily should be examined with care. We see nothing in the testimony of these three witnesses, however, aside from the fact that Rose was taken into custody for an offense which he confessed and the fact that the other two witnesses might be assumed to be partial in his favor, to discredit their testimony. Were this the only charge against the defendant we would not regard it as sufficiently serious to warrant his removal from office, but when we consider that for more than two years defendant had made a practice of mistreating prisoners on occasion, and the fact that his testimony is obviously lacking in frankness, and that of his undersheriff, Gay, and his deputy, Hines, is similarly warped in his favor, we feel compelled to place the more reliance on that of Rose and his witnesses. Defendant's feeble claim that he struck Crust for fear of being attacked by him is typical of his insincerity.

At the time of the argument in this court one of the justices asked a question as to what consideration, if any, was given to the constitutional guarantees of individuals, and particularly that one should not be compelled to be a witness against himself. This is made the principal subject of a supplemental brief in behalf of defendant in which it is said in substance that peace officers and prosecuting officers no longer pay any attention to such constitutional guarantees. If that is true it is no wonder so much complaint is made about crime in this country. The statement, of course, is entirely too broad, but we do regard it under the evidence in this case as representing defendant's attitude toward persons charged with crime. That this viewpoint is erroneous needs no argument, for if the legal and constitutional rights of individuals should be no longer recognized by peace officers, how much better are they

than the persons they assist in prosecuting? Nothing is more destructive to good government than to have our laws constantly or habitually violated by officials whose duty it is to enforce them. Reputable peace officers, some of whom testified in this case, denounce such practices, not only as being inherently wrong, but as not being productive of good results.

By our statutes (R. S. 19-811, 19-1903, 19-1919) the sheriff shall have charge of the jail and the custody of prisoners, and "all prisoners shall be treated with humanity." We had occasion to consider this matter in *Farmer v. Rutherford*, 136 Kan. 298, 15 P. 2d 474, where it was said:

"It is clearly the duty of the sheriff to safely keep and protect all prisoners in his charge, and such 'prisoners shall be treated with humanity.' It can hardly be argued that a sheriff is faithfully performing the duties of his office without oppression where he assaults and beats a prisoner in his charge. The abusing and beating of one suspected of crime, to wring from him a confession, is contrary to every principle of our criminal jurisprudence. . . . Such practice cannot be too severely condemned." (p. 305.)

Other authorities to the same effect are: 24 R. C. L. 923; 50 C. J. 338; *State, ex rel. Garber, Attorney-general, v. Cazalas, Sheriff,* 162 Ala. 210, 50 So. 296; *Ammons v. State of Mississippi* (Sweatbox Case), 80 Miss. 592, 32 So. 9; *Lang v. State,* 178 Wis. 114, 189 N. W. 558; *Ross, et al., v. State,* 48 Okla. Crim. Rep. 39, 289 Pac. 358.

Our statute (R. S. 60-1609) provides that an officer of this state "who shall willfully misconduct himself in office, or who shall willfully neglect to perform any duty enjoined upon such officer by any of the laws of the state of Kansas . . . shall forfeit his office and shall be ousted from such office in the manner hereinafter provided."

We concur in the conclusion of our commissioner that the preponderance of the credible testimony shows "that the prisoner Howard Crust was willfully struck and painfully wounded with the fists of Sheriff J. A. Jackson for the purpose of extracting a confession from him. Said assaults on the prisoner were not made in self-defense." By this and other matters previously discussed we find defendant willfully misconducted himself in office and willfully neglected to perform the duties of such office imposed upon him by law, and that he should be removed from office. It is so ordered.