No. 35,087

In the Matter of the Application of C. C. CREBS for a Writ of Habeas Corpus (C. C. CREBS, *Petitioner*, v. MILTON F. AMRINE, Warden of the Kansas State Penitentiary, *Respondent*).

(113 P. 2d 1084)

Opinion filed June 7, 1941.

*C. C. Crebs* pro se.

*Jay S. Parker*, attorney general, *Jay Kyle* and *Guy E. Ward*, assistant attorneys general, for the respondent.

The opinion of the court was delivered by

DAWSON, C. J.: This is an application by C. C. Crebs for a writ of habeas corpus to secure his release from the penitentiary where he is serving a life term of imprisonment pursuant to a judgment and sentence of the district court of Seward county rendered on November 26, 1930.

Attached to petitioner's application for a writ of habeas corpus is a copy of the information on which C. C. Crebs, alias Chet Lawson, was prosecuted for the murder of Charles Doan, in Seward county, Kansas, on November 18, 1930. Also attached to the application was a copy of the journal entry recording the judicial proceedings which were had in the Seward county district court on November 26, 1930, pertinent excerpts of which read:

"The plaintiff appeared by John C. King, deputy county attorney, and the defendant appeared in person in the custody of the sheriff. The court advised the defendant as to his right to have counsel, and defendant announced that he had no counsel and desired none, and that he was ready to proceed.

"Thereupon defendant was formally arraigned and entered his plea of guilty as charged in the information, which plea was by the court accepted.

"Again on the same day this cause coming on for sentence of the defendant, the parties appeared as before. It appearing to the court that there is no legal reason why sentence should not be pronounced.

"It is by the court ordered and adjudged that the defendant is guilty of murder in the first degree, as charged in the information, and that he be and is hereby sentenced to confinement and hard labor in the Kansas penitentiary for life. And the sheriff of Seward county is ordered to convey the prisoner to said institution to serve said sentence. Signed: G. L. LIGHT, *Judge.*"

The grounds on which petitioner bases his application are these:

(1) That he is not guilty of the murder as charged.

(2) The records will show that he was denied counsel by the court.

(3) That a confession was signed by him "by duress, abuse, cruel and unusual punishment," and that such "confession was written by the abusers."

(4) That he was denied a lawful hearing in due course of law.

(5) That sentence was pronounced without jurisdiction.

(6) That "he never at any time pleaded guilty to said charge and the state cannot show where he has been lawfully convicted."

On order of this court the application summarized above was ordered to be filed without requiring a deposit for costs; and a rule was entered requiring the warden of the penitentiary to plead thereto.

In an amended answer, filed in the warden's behalf, the state traversed all the material allegations of the petitioner's application. Attached to this answer was a copy of the judgment and sentence, and of the commitment, dated November 26, 1930, authorizing the incarceration of "C. C. Crebs, alias Chet Lawson" in the penitentiary for the term of his natural life, on his plea of guilty of the crime of murder in the first degree.

Also attached to the answer was an "Exhibit C," which is a typewritten document of twenty-eight pages entitled "In the Matter of the Statement of C. C. Crebs, Before Hon. G. L. Light (district judge), and L. E. Warden, undersheriff, on Friday, November 21, 1930, at 4 o'clock, p. m." Later in this opinion we shall summarize its principal contents and state the circumstances under which it was made and later transcribed and signed by Crebs and authenticated by Judge Light.

An affidavit of L. E. Warden, now chief of police of Liberal, county seat of Seward county, who was undersheriff of that county at and about the time of the Doan murder in November, 1930, avers that in the evening of November 18, Crebs was brought into the county jail by the sheriff, Logan Graham, accompanied by certain officers or other persons not now identifiable, and delivered into the

custody of L. E. Warden, undersheriff. According to Warden's affidavit those officers or some of them entered the jail and stayed there with Crebs "a number of hours that night endeavoring to learn his connection with the murder." Warden's affidavit does not say who those officers were, but Judge Light's affidavit (to which we shall refer below) makes it clear that the sheriff himself was one of them. Warden avers:

"I was personally present all the time these other officers questioned him about his whereabouts and other matters connected with his knowledge of the murder, and know of my own personal knowledge that no 'third degree' methods of any kind whatsoever were used against the said C. C. Crebs in attempting to cause him to make a confession or to talk about the matter."

The averment just quoted is squarely at odds with that of Crebs, whose verified statement reads:

"Soon after your petitioner was placed in jail the sheriff and deputies started beating and abusing. I would fall asleep, they would beat me on the head [with] those blackjacks. . . . I had no food from the 18th of November, until the 20th. I could not use the toilet which was just outside the cell they had me locked in. I used the floor before they would get anything for me to use. The night of the 18th they never took the handcuffs off of me nor the shackles and threatened to let the mob have me if I did not plead guilty. They held me and burned my bare feet with an electric light bulb which was attached to electricity and caused intense heat, and applied to petitioner's bare feet which caused big blisters to issue on the bottom of petitioner's bare feet.

"They beat petitioner in his stomach causing a hernia, . . . On the 21st they gave me a good breakfast, and then two deputies took me before the judge and asked me to sign the manufactured and forged confession; petitioner refused to sign confession and they took petitioner back to jail and that night they told me to sign it or else, . . . I finally signed the confession and told them again and again that I was not guilty of that charge."

Apparently Crebs was held in jail without a warrant until November 20, when a complaint was filed before M. H. Flood, justice of the peace, charging him with the murder of Charles Doan. A warrant was issued and formally returned with recitals of service on November 24.

On November 21, according to Undersheriff Warden's affidavit, he had a conversation with Crebs in the county jail, in which Crebs said he would tell Warden "the whole thing." Warden's affidavit continues:

"He [Crebs] stated that while he was in the penitentiary in Colorado he had learned from a fellow prisoner that Charley Doan of Liberal was a man who always had a roll of money on his person; he then told me all about the facts in connection with the murder of Charley Doan, how he had been around

Liberal for sometime planning the ways and means to rob Charley Doan, how he had went to the Doan rooming house on the 18th, how he had ordered Doan to 'stick 'em up' when he and Doan were in a room alone, how Doan had refused to do so, and how he had then shot at Doan and missed him and then shot him twice; he then told me in detail how he had got out of the building and of his actions and whereabouts after the shooting and until he was arrested by the officers; I then told him that if all this was true that I wanted him to make a written statement to that effect; I suggested that I take him before the county attorney of Seward county and he make the statement there and have the county attorney reduce it to writing and he sign it. He said he would not go before any county attorney; that he had experiences with county attorneys and did not like them; he then said about as follows, 'I'll tell you what I will do though. I will go before the district judge and make this statement.' I told him this was out of the ordinary, but I would see the judge about it. I then went and talked to G. L. Light who was the judge of the district court of Seward county at that time. Mr. Light stated that this was unusual, but that if he insisted on it he would listen to what he had to say if he were brought to his office; about 4 o'clock p. m. on November 21, 1930. I took the said C. C. Crebs to the office of Judge Light in the courthouse at Liberal; at that time the court reporter was in the office and Crebs asked that he leave before he talked to the judge; after that in the presence of myself and Judge Light he made a complete confession of the murder and of all his actions relating thereto; . . ."

Judge G. L. Light has made an affidavit of the incident which followed Crebs' expressed wish to make a statement to him. In part, it reads:

"That on November 21, 1930, L. E. Warden, undersheriff of said county, who also was the resident jailer in charge of the county jail, appeared at my office and advised me that C. C. Crebs, who was being held for the murder of Charlie Doan, which occurred on November 18, 1930, previously, wished to talk to me. The officer reported that Crebs was anxious to talk to someone, but refused to talk to the county attorney or to anyone else, stating that he had no confidence in anyone but the judge. At this time I did not know him, and so far as I know he knew nothing of me by way of direct acquaintance or indirectly.

"I advised the officer that this would be a little out of the ordinary, but if it was Mr. Crebs' request, to bring him over and I would find out what he had on his mind and what he wanted to say.

"Mr. Warden brought him over to my office and introduced him to me. He stated to me that he desired to talk to someone concerning the charge against him and that he did not want to talk to anyone but me. I inquired of him at that time if he had consulted an attorney and as I recall it, his answer was in the negative. . . . I told Mr. Crebs it was a little out of the ordinary for one in my position to permit a man charged with an offense such as he was charged with to make anything in the form of a confession to me, or even consult with me concerning the subject matter, but that if he insisted, and wished to do so I would listen to whatever he wanted to tell me. He then

narrated in his own way a statement, telling in detail of the offense and how it was committed.

"I then asked him if he desired that I have his statement converted to writing and he said it was perfectly agreeable with him. Whereupon, I called W. B. King, the official court reporter who came into the office and I decided to and did have the reporter take the conversation in question and answer form, the original of which, signed by Mr. Crebs, in my presence the following day, is hereto attached for the information of any and all persons concerned."

Touching the dispute of veracity between Crebs and the undersheriff, on the question whether Crebs was misused in the county jail, Judge Light's affidavit recites:

"As I remember the incident . . . at the beginning of the first conference, before the record was being taken, in the presence of officer Warden, Crebs and myself, it was stated by one or the other . . . that Sheriff Graham, Chief of Police Akers and perhaps one or two of the other arresting officers whose names I do not recall, had been a little indiscreet in their treatment of the prisoner immediately following his arrest and confinement in the county jail on the evening or night of November 18, 1930, but the details of such action I do not recall, except I am positive that there were no serious or injurious consequences as a result thereof. I had talked to both Crebs and Warden previous to taking the written statement and having the matter clearly in mind at that time I apparently failed to further develop the subject when the record was being taken."

Judge Light's affidavit there refers to Crebs' statement given ten years ago, which was repeated before the court reporter that same day and transcribed by him and signed by Crebs on the following day. In his oral argument before this court at the hearing of this application, Crebs acknowledged the genuineness of his signature to the statement of twenty-eight pages. The only point he sought to make against it was that when he did sign it a recital in pen and ink which followed his signature was not on the document. That recital reads:

"Subscribed and sworn to before me this 22d day of Nov. 1930.
G. L. LIGHT, District Judge."

Being written in pen and ink, and obviously in the handwriting of the judge, that recital of authentication was properly appended to the document after Crebs signed it, not before. And here it seems convenient to summarize the contents of the statement. It opens with facts about petitioner's birth in Haviland, Kan., in 1903; his education which ended in the seventh grade; that his parents were living, but he had not made his home with them since 1925; that since that date he had served time in the federal penitentiary in Leaven-

worth, and in Canon City (Colorado state prison); that he served time in Canon City and was paroled therefrom before going to the federal prison; that he next got into trouble about liquor and was jailed for thirty days in Holly, Colo., and then was returned to Canon City prison, from whence he escaped; next he "was caught down in Oklahoma in a counterfeit deal," and served twenty-seven months and eighteen days therefor, following which he was again taken to Canon City, from whence he again escaped about a month before the murder of Charles Doan—which occurred on November 18, 1930. Crebs also narrated in detail to Judge Light how he came to commit that homicide; that following his escape from the Colorado prison he arrived in the community and worked on farms and sold whisky; that on Saturday, November 15, 1930, he overheard someone say that Charlie Doan carried quite a bit of money on him. Crebs stated that he decided to try to get Doan's money and studied the problem for three days before attempting it; that inside his shirt he carried a gun which he had stolen from a car pocket on Sunday night (November 16); that on Tuesday, November 18, he went to a building in Liberal in which there were upstairs rooms to let, and inquired for Charlie Doan. Doan appeared and Crebs asked Doan to show him a room. Doan complied. Crebs followed into the room, shut the door, and said, "Stick them up, Charlie." Doan put his right hand into his pocket as if he might be reaching for a weapon. Crebs told him to stop, but Doan appeared to continue to be seeking a weapon on his person, so Crebs shot at him three times, only intending to wound, but not to kill him. At the last shot Doan fell, and Crebs left without taking time to search for Doan's money. As he left the building by a rear stairway, a woman called out, "Stop him." He walked without haste until he rounded a corner and then ran to his car and drove to a tourist camp some miles out of town. Then he went from place to place until some time that evening when he was arrested. Some of Judge Light's questions, and Crebs' answers, read:

"Q. How does it come that you chose to give me this statement, instead of the prosecuting attorney? A. Well, sir, I feel that you are a man that a person can put faith in, and trust.

"Q. Have you come to my office and requested to have this conversation and make this statement with me at your request. A. At my own request.

"Q. You haven't been influenced by anyone? A. No, sir.

"Q. And you haven't been threatened or abused in any way to make this statement? A. I was before I made the statement.

"Q. I mean with reference to coming here today, to me? A. No, I wasn't abused in no way.

"Q. And no one has induced you to do this, but you have done it from your own free will, is that true? A. Yes, sir.

"Q. Under these circumstances Cecil, as you have voluntarily related them to us, what is your decision as to the proceedings? A. Well, I just made up my mind that there is no use in living a life of crime any longer, and the quicker I get it off my mind and get through with the whole thing, the better off I would be.

"Q. Is it your desire that such charges as will have to be filed be filed so that you can appear before the court and enter a plea of guilty, and get your sentence, is that your purpose in making this statement? A. That is my purpose.

"Q. In making this statement? A. Yes, sir.

"Q. You understand it will take some little time to start the wheels of the court in motion, to get the matter in shape so that you can appear before the court in a formal way, and you want that done as soon as it can conveniently and properly be done, is that the way I understand you? A. Yes, sir.

"Q. You understand, of course, that being district judge myself I do not take a hand in the prosecution? A. Yes, sir.

"Q. Nor in the defense? A. Yes, I understand that thoroughly.

"Q. And I will see that your wishes in the matter, however, are carried out, and just as soon as we can conveniently do it, and give us the time to get to your case, you will be carried before a justice of the peace and that proceeding can be had, then the matter can be certified to the district court. A. Will I have to wait until the district court sits in January?

"Q. Not if you want to enter a plea of guilty. You could have a trial to a jury if you wish it, but it is your desire to enter a plea of guilty, as I understand you. A. Well, here's the way I look at it, Judge; that I won't get any more time by pleading guilty than I would if I fought the case.

"Q. I do want to ask you this question: You have had more or less experience with court proceedings, and do you want an attorney to represent you in these court proceedings? A. Well, if I am going to have a trial it will be necessary to have an attorney.

"Q. Yes, and you are entitled to it if you are not going to have a trial, if you want it. A. Well, sir, I don't know what to do.

"Q. Well, I will tell you what I would suggest that you do; I think I will call in an attorney to look after your interests for you. The county will furnish an attorney, and I am going to appoint one. Do you know any attorneys here? A. I don't know nobody here.

"Q. Would you feel better about it to have an attorney, that would be your attorney, that you could confide in, that you could talk to, the same as you have talked to Mr. Warden [deputy sheriff] and myself, and get his advice also; would you feel better about it? A. Well, sir, I don't know what to do; I just declare I don't know; it is an awful shape to be in.

"Q. Well, the reason I inquired about that, principally, was that it would become my duty to determine that when you are arraigned before me, and if I appoint an attorney for you I want to appoint one in whom all of us have the highest respect and confidence. A. Yes, sir.

"Q. And that is the kind of attorney you would have? A. I would appreciate that very much.

"Q. That is the kind of an attorney the court wants you to have, and it will be some little time before Mr. King [court reporter] will have time to transcribe this testimony, before you would be expected to sign it, possibly by some time tomorrow afternoon, or maybe a little later than that, but as soon as he has transcribed it I will either send it over or bring it over to you and you can study it and see that it is just as you want it, and if it isn't true in any respect I want you to tell me, and if it is true you will do the proper thing, and in the meantime you study over as to what attorney, if any, or whether or not you want an attorney, and if you know any of the attorneys that you want, and if I can agree with you, I will appoint the attorney and see that he comes up and talks the matter over with you, and if you don't want an attorney, of course it will not be forced upon you. A. Oh, no."

Three days later, on November 24, 1930, Crebs was taken before the justice of the peace, M. H. Flood, for his preliminary examination. The justice appointed E. W. Davis, an attorney of the local bar, to represent him. The transcript of the justice then recites:

"The court asked the defendant if he wished to have his preliminary hearing, consulting his attorney, he replied he waived his preliminary hearing. The court asked the defendant if it was on advice of his attorney that he waived his hearing. He replied 'No,' that it was voluntary on his part.

"The court bound the defendant over to the district court of trial, without bond."

Following the waiver of the preliminary, the information was filed in the district court on November 26, 1930, and thereafter Crebs was brought into court, and the proceedings as set out in the journal entry attached to the petitioner's application followed in regular order.

We take notice of some affidavits of fellow convicts of Crebs to the effect that shortly after he arrived in the penitentiary there were marks of burns on the soles of his feet, and indications of a rupture in the pit of his stomach. An affidavit in behalf of the petitioner was also filed by Dr. W. G. Emery, a physician of Barnard, who served as medical adviser of the state penitentiary in 1936. This affidavit averred that in 1930 at the time of the Doan murder he "was astonished at the quick arrest [of Crebs] and conviction," and that—

"His story of being cruelly tortured in Seward county jail in order to elicit a confession and plea of guilty I substantiated to my satisfaction.

"The state owes this man a careful consideration of his case because of his illegal torture."

In a later affidavit, Doctor Emery testified that in making his first affidavit he had no thought that it might be used in support of an application for habeas corpus, but rather as a character affidavit in Crebs' behalf. Questioned under oath by the assistant attorney general, Doctor Emery deposed:

"Q. You know C. C. Crebs, and how long have you known him? A. I knew him while medical supervisor in the prison during 1936.

"Q. Did you know him before 1936? A. No.

"Q. You knew he pleaded guilty to murder in the first degree in 1930, in Seward county, Kansas, and you met him six years later? A. Yes.

"Q. Did you ever have occasion to discuss the matter with him? A. Yes, in 1936 at the penitentiary at Lansing.

"Q. Had you had an opportunity to make an investigation of the situation when it arose in Seward county? A. No, . . .

"Q. Did you have any opportunity to discuss the matter with the district judge, county attorney, sheriff, or undersheriff of Seward county? A. I discussed it with no one. Not until I became interested in Crebs' story in 1936.

"Q. You have no opinion as to Crebs' guilt or innocence? A. I am not informed enough to judge his guilt or innocence. I believe he was tortured into confessing by being hung by his thumbs, burning his feet with cigar butts, and told he would be dragged behind a car.

"Q. Did he tell you the names of the persons who allegedly tortured him in 1930? A. No, he referred to them as the jailers in Seward county.

"Q. Did anyone else tell you that he had been allegedly tortured? A. Two men told me of this and said that he had to have his feet treated after entering the prison hospital.

"Q. That was six years after his commitment to the penitentiary? A. Yes.

"Q. These two men were inmates of the penitentiary? A. Yes.

"Q. Did you discuss the matter of his alleged torture with anyone other than the two inmates of the prison and Crebs? A. I don't believe I did.

. . . . . . . . . . . . . . . .

"Q. . . . Your only information was from the newspaper accounts and you knew nothing about his case until you were medical supervisor at the penitentiary six years later. A. That's right.

"Q. In conclusion, Doctor Emery, you did not know Crebs at Liberal, nor any facts surrounding his arrest and sentence from first-hand knowledge in 1930, nor did you treat him in the capacity of physician at Liberal, nor did you discuss his case except with Crebs himself and two inmates of the pen after 1936? A. That's right."

There is nothing further presented in support of the application for the writ of habeas corpus worthy of notice except a matter urged by the petitioner in his oral argument before the court. He advanced the point that he was twice put in jeopardy for the same

offense. Presumably he has formed a theory of "double jeopardy" out of his private interview with Judge Light on November 21, and his later formal arraignment, plea and sentence on November 26. Whatever his theory, the point has no basis in fact. Jeopardy only attaches to a prisoner when he is brought into a court of competent jurisdiction (not merely brought before the judge) and formally arraigned and required to plead to a valid charge of crime. Ordinarily there is also one more requisite to the existence of jeopardy— which is that there should be a jury empaneled and sworn at the time the accused is required to plead. The questioning of a prisoner in jail, with or without abuse or cruelty, is not what the law describes as jeopardy, and neither is his preliminary examination before the justice of the peace, nor is his waiver of such examination.

Considering now the points relied on in the application seriatim, it must be held that petitioner's assertion at this time, that he is not guilty of the murder as charged, and for which he was sentenced in 1930, is not a ground for a writ of habeas corpus.

Applicant's next point—that the record will show that he was denied counsel, the record shows nothing of the sort.

The third point—that a confession was signed by him "by duress, abuse, cruel and unusual punishment," and that "the confession was written by the abusers." The record does not show the existence of any such confession, and certainly no such confession was used against him at his trial on November 26, 1930, which is the only trial at which a confession would have been of any avail against him. If by confession petitioner means the twenty-eight page statement he gave to Judge Light on November 21, and which he admits he signed on November 22, it is perfectly clear that this statement was voluntarily given, and that, too, in an interview with Judge Light, which the judge granted at petitioner's request. But even if that twenty-eight page statement of Crebs to Judge Light be regarded as a confession, it was not used at his trial on November 26, so its characterization as a confession is immaterial.

The next point urged is that petitioner was denied a lawful hearing in due course of law. This contention is wholly gratuitous, and absolutely nothing is offered in its support.

The next point is that sentence was pronounced without jurisdiction. This point is untenable. The district court of Seward county was the one and only tribunal which did have jurisdiction.

Appellant's final point is that he never pleaded guilty to the

charge. The record, which is clear and unimpeached, is to the contrary. The evidence, also, is clear and convincing that the arraignment, plea, judgment, sentence, and commitment were regular in every respect.

Before concluding, however, we take this opportunity to restate the attitude of this court in respect to official misconduct which savors in the least of "third degree" practices. It is the duty of county attorneys, attorneys general, examining magistrates, district courts and the judges thereof, to see to it that nothing of that kind can be practiced with impunity in Kansas. There is no authority in law and none in common humanity for conducting midnight seances, wherein persons arrested on criminal charges are misused in the slightest degree, and none for holding persons in custody more than a few hours at most without a warrant for their arrest as contemplated by law. When this court gets a chance to show its attitude on this monstrous and un-American practice, we are not slow to do so. (See *Farmer v. Rutherford,* 136 Kan. 298, 15 P. 2d 474; *State, ex rel., v. Jackson,* 139 Kan. 744, 33 P. 2d 118; *Pfannenstiel v. Doerfler,* 152 Kan. 479, 105 P. 2d 886; also, Vol. 1, No. 1, of the Bill of Rights Review, pp. 24-33.) But in the instant case, if we should give the largest credence to petitioner's evidence concerning the maltreatment he received at the hands of ruffian officials or other persons in the Seward county jail, that maltreatment did not vitiate the subsequent proceedings before the justice of the peace on November 24, nor the proceedings in the district court on November 26. Murderers are not rendered immune to punishment for their crimes on the mere ground that they have been unlawfully abused or maltreated by official ruffians who capture them and place them in the custody of the law.

The writ is denied.