No. 39,979

JOHN J. BUKATY, ESQ., Guardian of the Estate of BERTHA BUSH, Insane, *Appellant*, v. JOHN BERGLUND, JR., JOHN ERICKSON, ERNEST C. ROLL and H. H. WRIGHT, *Appellees*.

(294 P. 2d 228)

Opinion filed February 29, 1956.

*Ralph H. Noah*, of Beloit, and *Marion C. Miller*, of Kansas City, argued the cause and *Don W. Noah*, of Beloit, was with them on the briefs for the appellant.

*C. Vincent Jones*, of Clay Center, argued the cause and *Wayne W. Ryan* and *H. L. Sheppeard*, both of Clay Center, were with him on the briefs for the appellees.

*John Berglund*, of Clay Center, *pro se*.

The opinion of the court was delivered by

SMITH, J.: This is an action by the guardian of an insane woman ·to recover for the wrongful death of his ward's husband. Defendants' demurrers to plaintiff's evidence were sustained. The plaintiff has appealed.

The action was against Berglund, the county attorney of Clay county; Erickson, the sheriff; Roll, the chief of police of Clay Center and Wright, a trooper of the state highway patrol.

The petition after alleging the official character of the defendants alleged that about October 9, 1947, Fletcher William Bush became mentally sick and unable to comprehend his surroundings; that on that day he requested that he be placed in jail, being under the delusion that his life was in danger, and while in jail he felt secure from his imaginary adversaries; that deceased was placed in jail under the custody of Erickson; that the defendants went to the jail without any authority or court order for the purpose of removing Bush from the jail; that Bush remonstrated and resisted efforts to remove him; that defendants acting under their official capacity attempted an immediate eviction of Bush; that in the course of this the defendants and one Mack, a deputy sheriff, acting under the direction of Erickson, fired tear gas into his place of confinement, frightening Bush; that notwithstanding their lack of authority, acting and counseling together, they caused a deadly poison, that is, a refrigerator gas, the exact nature of which was unknown to plaintiff, to be released in the place of confinement of Bush for the purpose of causing him to become unconscious, or to vacate the place of confinement; that Bush was known by defendants to be without reason; that the deadly gas was not measured into the cell and no doctor was present; and such gas was administered in such quantities that the death of Bush was inevitable; that Bush breathed the poisonous gas, as was intended by defendants, and from breathing it died; the defendants dragged the dead body of Bush into the open air, but no preparation had been made for the restoration of Bush, and upon the arrival of a doctor he was pronounced dead; that Bush died from the effects of the poisonous gas, wrongfully administered by defendants.

The plaintiff then alleged that plaintiff was the legal wife of Bush, his estate had not been administered and he left no children and plaintiff was his next of kin. The petition then alleged the history of Bush, with which we are not presently interested, and that plaintiff was deeply in love with her husband, and was damaged by his death.

Judgment was prayed for $15,000 damages. Berglund filed two answers. The first was a general denial except that he admitted he was county attorney of Clay county on the date in question.

The second alleged that Bukaty was not the proper party plaintiff and had no standing in court because he never had moved to be substituted; and further that Bush's death was an accident. Erickson pleaded five defenses. In these he set out what he claimed to be the story of what happened. These defenses are not important here in view of the final disposition to be made of this case. Wright's answer was to about the same effect. The same may be said of the answer filed by Roll, the chief of police. The plaintiff filed a denial for reply and Bukaty moved to be substituted. This was allowed.

At the close of plaintiff's evidence the defendants each demurred to it. These demurrers were all sustained. Hence this appeal.

Plaintiff moved for a new trial on the grounds of abuse of discretion of the trial court, misconduct of the prevailing parties, accident and surprise, order sustaining the demurrers given under the influence of passion and prejudice, and was in whole or in part contrary to the evidence, and erroneous rulings of the trial court. This motion was overruled.

The assignments of error were the court erred in rejection of testimony; in sustaining the demurrers to the evidence and in overruling the motion for a new trial. On the hearing of the motion for a new trial the death certificate was offered and denied.

The testimony disclosed the death of an adult colored man in the Clay county jail. The defendants were all officers of one capacity or another.

John Wolf testified about seeing a colored man go past the hotel between six and seven. He was about six feet tall and wore no shirt. He will be referred to hereafter as Bush.

Roy Webb saw the same man and he had a club about as big as a crutch. He heard Bush say "I will get the sons-of-bitches; I will get them."

Julian Brenner testified he saw Bush come on down town, told a policeman and they went out to where he was, picked him up in the car, drove down to the jail, and he got out and started in. The man said once he had been shot in the leg and someone had been chasing him all night. This witness saw the club. In his opinion he was insane. He went into the jail voluntarily.

Don Brenner testified to about the same effect with the addition that the man thanked them for bringing him down to the jail.

Dick Sharples was on the police force at the time in question.

He testified that the man told him "Mister, you don't know me; I am harmless." He walked into the jail without any trouble. He took him into jail, put him in a cell block and asked him where he was going. He said "They raped my mother and killed her  .  .  ." "And he said there was one officer in the bunch. And then he was telling about getting shot all through his legs. I asked him if we could see the hole and he said 'Yes.' He dropped his trousers down and there wasn't a scratch on him nowhere that we could see." In his opinion the man was not rational.

Ernest Roll, the chief of police, testified he was told about the large colored man, with a club running around; that he was told by the sheriff a man in jail was making trouble, breaking up the furniture. Bush was standing up in a cell block with a leg off the table in his hand, not hurting anybody. The sheriff was inside. When they were trying to get the doors closed Bush struck at the sheriff with the table leg. It got between the two doors and they could not be closed. Bush worked around and got the stick out and they locked the door. At that time only the witness Roll, Erickson, Jimmie Mack and Mr. Berglund were there. They were going to try to get him to a doctor or something. But every time they said anything he said "If I get out of here I will kill every one of you sons-of-bitches." The door was locked at that time. After detailing some conversation between the officers and with Bush this witness testified about shooting some tear gas in and its being ineffectual. They brought a colored man to the jail to talk to Bush. Then Mr. Erickson talked to Laflin about some of the refrigerator gas. When this was mentioned Berglund called Dr. Croson. He saw Laflin connect up a tank of gas. He heard Laflin say he didn't think it was anything because he had had it shot right in his face. Mr. Berglund called Dr. Croson and asked him if refrigerator gas was poison. He only heard Berglund's side of the conversation. He did not remember whether Berglund told him what kind of refrigerator gas it was. He saw the gas turned on and heard Bush cough. The gas was sickening.

On cross-examination he testified about Bush attacking the sheriff with the table leg when he went in to the cell block. Erickson and Berglund wanted to take Bush to the state hospital. He heard Berglund say that Dr. Croson said this refrigerator gas was not harmful. He had been to several police schools but they had never taught him the use of the refrigerator gas. Mr. Berglund had made

arrangements to take Bush to Topeka. After Bush fell over they took him out of jail. He was not dead when they took him out. They put handcuffs on him. They tried artificial respiration on him right away and finally got a pulmotor. No arrangements had been made for having a doctor there before they began shooting in the gas. He saw Bush get a mattress and lie down, so he ran around and told the other officers; Bush looked strong and healthy before the gas was turned on. He testified on cross-examination by Mr. Berglund that he did not hear him order anyone to get the refrigerator gas but they all talked about it; that his job was to see when he had keeled over. He heard Berglund say "Wait till I call Dr. Croson." And he heard him state not to use the gas until he had called Dr. Croson. He testified that he had nothing to do with planning the use of the gas.

James D. Mack testified he was undersheriff; that he saw Mr. Bush in the jail; that the table was all busted up and the legs were on the floor and he was mumbling. Mr. Erickson leaned down to pick up some of the table and Bush had a table leg and rushed to Erickson with it. They got out to the door and locked it. The evidence as to the tear gas and other happenings at the jail was like Roll's testimony; that if they could have gotten Bush in one of the little cell blocks they would have locked him in there until they could have done something with him. They had no order from any court; the only reason they could not leave him in jail he was busting it up; that he thought Berglund told him he had talked to the probate judge; that he heard Berglund say "If you will bring him down, we will take care of him." That he thought Mr. Erickson found some tear gas shells and Mr. Berglund saw Mr. Bush had broken three or four windows on the north and east sides; after they brought him out of the jail they started artificial respiration and they called for a resuscitator; that he and another man went to the hospital and got the one that was there and saw no handcuffs or leg irons about deceased, but when he got back he had handcuffs. He was pronounced dead after the resuscitator had been there and was used. Dr. Croson came while they were using it. He was not trying to injure Bush in any way but thought he could have taken the table and jammed the bars and the wire mesh off the windows and could have killed himself with the glass that was on the floor. Bush was a transient. He had never seen him before. He thought Roll and Erickson had turned the water

off in the basement; that after he rushed at Mr. Erickson the second time with the table leg Bush tried to get out of jail but they prevented him by holding the door.

Mr. Wright testified he was a member of the highway patrol at the time and to about the same effect as the other witnesses about what happened at the jail; that he was present when the refrigerator gas was brought in and he heard Mr. Berglund say "I am going to . . . call Dr. Croson and see if this would be O. K." He did not hear the conversation. He did not know how long they kept the gas on. He had no authority as a highway patrolman to stop them from using the gas. Bush was breathing when they got him out on the porch and when they got him out, then the witness was nauseated and left the scene. He thought the gas used was ammonia. In talking they merely referred to it as refrigerator gas. Nobody's actions indicated they wanted to hurt Bush. In his opinion it would have been possible for Bush to have killed himself with the stuff that was in the jail.

Don Laflin was engaged in the refrigerator business. He testified the refrigerator gases in normal use are the Freons, the methyl chlorides, ammonia and sulfur dioxide. They are in drums and carry a label; stamped on this particular drum were the words "sulfa dioxide." Mr. Erickson asked if this particular gas was poisonous and he answered "I wouldn't say I would recommend it." Erickson wanted him to bring some over to the jail. He brought a small drum, a roll of tubing and a wrench. He stated all gas is measured by weight only. It is liquid under pressure. This container only contained one pound of liquid. He had to get a second container. He used about three pounds altogether. He testified from the time the first shot was put in and the last amount was roughly twenty minutes. It immediately vaporizes when it comes out of the container. He mentioned to Mr. Erickson to start with to call a doctor and they got word back it would not hurt. "That's the only thing I know." There was no conversation about this particular gas. He said he wasn't qualified to say whether it was poison. He was asked to place a tube on the drum and turn it off and on. When the first tank ran out of gas he asked me to get another one. He did not open it completely. He thinks perhaps there was gas going in there about ten minutes altogether the second time. When somebody said Bush fell I shut the drum off completely. The deceased had handcuffs on at one time but he did not see them. When Erickson came over to ask him about the use of the gas he

did not ask him if he was familiar with the use of it. He wanted to know if it was poisonous. He directed them to call a physician and would not state. He said it was the only gas available during the war and they had used a lot of it. He turned the gas on carefully because there was so much pressure. He understood they called Dr. Croson. He was not able to say whether the amount he was exposed to in the drugstore was a greater amount than was used in the jail.

Dr. McIlvain testified that sulfur dioxide is $SO_2$ sulfur and oxygen two parts; that when it comes in contact with moisture in the lungs or any place else it forms sulfuric acid $H_2SO_4$. It erodes the tissues and kills them. There is no defense to it in large quantities. He performed the post-mortem examination and found that the injury to the lungs caused Bush's death; that the air sacks were full of bloody fluid and were totally unable to function; that in his opinion sulfur dioxide caused his death. When asked as to the length of time an exposure to sulfur dioxide would result in death he said ". . . A very short time, I am sure, if it were the cause of death." When asked if this man had any other trouble he said "I am sure that I don't know how anyone could tell whether a person had a mild inflammation from a cold where their lungs had been burned out with sulfuric acid."

There was evidence as to the relationship of plaintiff with Bush and other members with which we are not concerned here. All of the defendants demurred to the evidence of plaintiff. These demurrers were sustained. Hence this appeal.

Now as to the law of the case. The court stated in its opinion the question to be determined was whether there was any evidence that any of the defendants exercised malice or bad faith. The court stated there was no such evidence. At the hearing on the motion for a new trial the court again stated that the evidence did not show any malice or lack of good faith on the part of the officers, which was necessary in order to make a case.

The defendants cite the rule from 46 C. J. 1042, Sec. 326.

"Public officers, when acting in good faith within the scope of their authority, are not liable in private actions, and ordinarily purely ministerial officers are protected in executing orders of superiors fair on their face, even though such orders were erroneously issued by such superiors. . . ."

Also authorities to the effect that

"An officer charged with preserving peace and good order, and maintaining the supremacy of the law, and executing its mandates, must, of necessity, act

on the aggressive in many instances, and is not confined, in the use of physical force, to that which may be lawfully used by a private person in his relation with others; he is clothed with authority to exert such force as may be necessary to the proper performance of the functions of his office, though death be the result." (See Note 67 L. R. A. 297.)

There are certain well-established rules for deciding a demurrer to the evidence.

We will not weigh evidence. (See *Rowan v. Rosenthal*, 113 Kan. 604, 215 Pac. 1008, and many other authorities.) The rule stated another way is we consider only evidence favorable to the party adducing it and will not weigh or compare other evidence. (See *Harris v. Exon*, 161 Kan. 582, 170 P. 2d 827.) It concedes every inference from evidence favorable to plaintiff's claim. (See *Travis v. Simpson*, 106 Kan. 323, 187 Pac. 684.) We will consider not only evidence favorable to plaintiff but surrounding facts and circumstances from which inferences in his favor may be drawn. (See *Sizemore v. Hall*, 148 Kan. 233, 80 P. 2d 1092.)

With these rules in mind, we have a story of a colored man picked up by an officer under circumstances from which an inference might be drawn that he was at least mentally disturbed. He was taken to the jail as seemed was proper under the circumstances; that he created a disturbance in the jail there can be no doubt; the sheriff as keeper of the jail had a duty under all the surrounding facts and circumstances. Just what his duty was we need not answer. Apparently the officers present had in mind causing him to leave the cell block since that is the usual function of tear gas. It temporarily blinds the one against whom it is used so he may be more easily subdued once he is in the open. This did not work on account of the windows Bush broke out, thus enabling him to get some fresh air.

Then the deadly sulfur dioxide was used. A reasonable inference is, the purpose of using this gas was to render Bush unconscious, since an officer was detailed to watch him, and come around and tell the officers feeding the gas into the jail when he had "keeled over." The drum in which the gas was contained had the label "sulfa dioxide" on it. There was evidence that one of the defendants called a doctor and asked him about the use of "refrigerator gas." There was nothing in the record that anything was said about "sulfa dioxide" although the drum was so labeled. There is evidence that the man who furnished the gas advised the officers to

call a doctor but none was called until Bush was dragged from the jail. There was substantial testimony by a doctor as to the deadly nature of sulfuric acid, which is formed when sulfur dioxide is exposed to the air and comes in contact with moisture in the lungs.

The statute makes it the duty of the sheriff to treat all prisoners with humanity. (See G. S. 1949, 19-1919.) It also makes him the keeper of the jail. (See G. S. 1949, 19-1903 and G. S. 1949, 19-811.) We all concede that there are circumstances under which physical force must be applied to a person when taking him into custody in case he becomes unruly. In such cases the rule is that an officer may use such force under all the surrounding facts and circumstances as is reasonably necessary.

The rule is laid down in 80 C. J. S. 326, as follows:

"A sheriff owes a duty to a prisoner in his custody to keep him in health and free from harm. He must exercise ordinary and reasonable care under the circumstances to preserve the life, health, and safety of a prisoner in his care and custody, and he is liable to the prisoner or his representatives for negligent or wrongful acts causing his injury or death."

See, also, 80 C. J. S. 329, where it is said:

"Thus a sheriff or constable is liable for an assault where in performing his duties he uses unnecessary force and a person is thereby injured."

A case where tear gas was used is *Pfannenstiel v. Doerfler,* 152 Kan. 479, 105 P. 2d 886. There the petition alleged that officers seized plaintiff and discharged tear gas into his face, injuring his eyes, and while he was in a weakened and unconscious condition incarcerated him in the county jail. The defendants were the sheriff, a deputy sheriff and a constable. The defendants' demurrers to the petition were overruled. After a discussion of some points, not here involved, we said:

"It is the duty of a sheriff or other officer having lawful custody of a prisoner to treat the prisoner properly, and, as the statute (G. S. 1935, 19-1919) says, 'with humanity.' This matter was considered by this court in the case of *Farmer v. Rutherford,* 136 Kan. 298, 15 P. 2d 474, and again in *State, ex rel., v. Jackson,* 139 Kan. 744, 33 P. 2d 118. Supporting citations set out in the latter case need not be here repeated. We think that the instant allegations of failure to provide medical attention are pertinent within the plain import of the statute." (p. 483.)

The opinions cited in the above quotation were both cases where persons in the custody of the sheriff were abused. Defendants make the categorical statement that the above opinions were not in point here because in each of them the officers had no lawful

authority whatever to try to accomplish the object they sought to accomplish. We are unable to follow defendants in this argument. Clearly in the Pfannenstiel case, *supra*, the reasonable inference from the allegations of the petition was that the tear gas was used while taking the plaintiff into custody. Besides, it is not a question of the officers having a right to subdue plaintiff. The question is whether the use of such a deadly gas was reasonably necessary under all the surrounding facts and circumstances.

We hold that such was a question of fact and that under the record in this case the court erred in holding there was no substantial evidence to sustain the allegations of the petition.

The judgment of the trial court is reversed, with directions to proceed with the trial of the cause in accordance with the views expressed herein.

HARVEY, C. J., not participating.