# State *ex rel.* Garber Attorney General *v.* Cazalas, Sheriff.

## *Impeachment Proceedings.*

(Decided June 3, 1909.    Rehearing denied June 30, 1909.
50 South. 296.)

*Sheriffs and Constables; Impeachment; Grounds.*—The facts in this case stated and examined and held sufficient to authorize impeachment of the sheriff in view of section 132 and 7197, Code 1907, under section 138, Constitution 1901.
    (Anderson and Mayfield, JJ., dissenting.)

Original application in the Supreme Court.

Impeachment proceedings begun by the State of Alabama on the relation of its attorney general against Frank Cazalas, Sr., as sheriff of Mobile county, for permitting prisoners to be taken from the jail and lynched. Judgment removing sheriff from office.

ALEXANDER M. GARBER, Attorney General, THOMAS W. MARTIN, Assistant Attorney General, NICHOLAS E. STALLWORTH, Solictor, and PALMER J. PILLANS, for the State.    (The argument was oral.)

GREGORY L. & H. T. SMITH, and FRANCIS J. INGE, for respondent.    (The argument was oral.)

[State ex rel. Garber Attorney General v. Cazalas, Sheriff.]

SIMPSON, J.—This is a proceeding for the impeachment of the defendant.

The facts are undisputed that on Thursday, the 21st of January, 1909, while Philip Fotch, who was a faithful and efficient deputy sheriff, was attempting to serve a warrant on a negro named Richard Robertson for a misdemeanor, said Robertson, without any excuse or justification, inflicted a mortal wound on said Fotch, from which he died that night; that it was a willful and deliberate murder, and excited a great indignation in the city of Mobile, and that on the night of Friday, the 22d of January, 1909, a party of masked men, estimated at from 10 to 20, entered the jail through the basement, and suddenly confronted two jailers (who were sitting in the guardroom, behind a steel-barred door) with drawn revolvers, and demanded of them to deliver the keys to the cells, which demand was complied with, and the intruders, leaving two armed men to stand guard over said two jailers, proceeded to the cell where said Robertson was confined, took him out, and, at a place not far from the jail, put him to death. It was in evidence that the jail is a modern structure, well arranged and guarded; that there are two steel-barred doors opposite each, with a space between, leading into the guardroom where the jailers were, but it had been customary to leave the outer door open, as it was on this occasion; also, that there were strong wooden doors protecting the street entrance to the jail building; and that there was also a strong door leading into the basement which was under the charge of the engineer.

Under the Constitution of 1875 it was provided that sheriffs might be removed from office "for willful neglect of duty, corruption in office, habitual drunkenness, incompetency, or any offense involving moral turpitude while in office."—Const. 1875, art. 7, §§ 1, 3. Our pres-

ent Constitution contains substantially the same provisions in so far as the matter now under consideration is concerned (sections 173 and 174), but has added another provision, to wit: "Whenever any prisoner is taken from jail, or from the custody of any sheriff or his deputy, and put to death or suffers grievous bodily harm, owing to the neglect, connivance, cowardice or other grave fault of the sheriff, such sheriff may be impeached under section 174 of this Constitution."— Const. 1901, § 138. When this section was before the Constitutional convention, it was fully discussed. Some members thought that it was holding the sheriff to too high a degree of responsibility, and it was moved to make it read "gross neglect," but the wording, as reported by the committee, was retained, and the remarks made by the members of the convention show that they intended just what they say, and that a prisoner when he comes into the hands of the officers of the state shall be panoplied about with all the powers of the state, and as sacred from interference "as the ark of the covenant." The Constitution makers evidently intended to place the sheriff in the breach and hold him to the strictest accountability for the safety of the persons committed to his care. It must be admitted that the law is severe and exacting, but the evil which it was intended to correct demands strenuous measures of prevention. In this free government of ours respect for the laws is the very base rock upon which must rest all of our liberties, and if mob law is ever justifiable, then the most cherished principles of that body of laws which we call common, and which have come to use hallowed by the wisdom of ages, and which we have imbedded into our Constitutions, are wrong, and the boasted rights and liberties of the American citizen constitute a solemn farce. "Neglect is the omission or forbearance to do a thing

[State ex rel. Garber Attorney General v. Cazalas, Sheriff.]

that can be done, or that is required to be done," "to omit by carelessness or design," or' "imports a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestows in acting in his own concerns." "Neglect, as applied to a public officer, means a failure on his part to do and perform some of the duties of his office."—5 Words & Phrases, p. 4740; *White, Auditor, v. State ex rel., etc.,* 123 Ala. 577, 26 South. 343; *Warren v. U. S.,* 58 Fed. 559, 562, 7 C. C. A. 368. When the state or county has provided a suitable and well-constructed jail, with strong doors, not only to prevent the escape of prisoners, but also to prevent the unlawful entrance thereto, it is questionable whether it is not the duty of the sheriff at all times to make use of those means of protection against possible intruders. The sheriff cannot presume that those who desire to invade the premises will inform him of the fact, or make such a demonstration on the streets as to advertise their intentions. However that may be, when a crime of peculiar enormity has been committed exciting public indignation, when it is known that such crimes always bring about suggestions that the prisoner be taken out and lynched, and when, in addition to that, the suggestion is made to the sheriff that there is a probability of an attempt to take the prisoner and lynch him, ordinary prudence would suggest that the sheriff should at least give orders that all the doors by which an entrance may be effected into the jail should be closed and take other precautions when he leaves it for the night. It will not do to say that the basement is under the charge of an engineer and to infer therefrom that the sheriff has no responsibility in relation thereto. He is the legal custodian of both the courthouse and the jail, and it is his duty to exclude intruders therefrom.—Pol. Code, § 132; Cr.

[State ex rel. Garber Attorney General v. Cazalas, Sheriff.]

Code, § 7191. If he commits the charge of the basement to an engineer, it is his duty to make such rules and regulations as will insure the building from the entrance of intruders. It was then neglect on the part of the sheriff under the circumstances of this case to fail entirely to give any orders for the closing of the doors before leaving the building for the night. He is not responsible for the negligence of his deputies if he has made proper selections and given them proper directions; but he is responsible for not instructing them to take the proper precautions.

A great many witnesses were examined on the part of the state and of the defendant, occupying the greater part of three days, and it would serve no useful purpose to discuss the same in detail. After a careful consideration of all the evidence, we are satisfied beyond a reasonable doubt that said Frank Cazalas, Sr., has been guilty of neglect within the meaning of the Constitution which has resulted in the taking of a prisoner from jail and his being put to death.

In accordance with the demands of the law, an order will be here entered removing said Frank Cazalas, Sr., from the office of sheriff of Mobile county.

DOWDELL, C. J., and DENSON, McCLELLAN, and SAYRE, JJ., concur.

ANDERSON, J.—(dissenting).—It is true that section 138 of the Constitution of 1901 in dealing with sheriffs and providing for their impeachment when prisoners are taken from their custody and killed or injured does not require the same degree of neglect of duty as a cause for impeachment as is required in other provisions relating to other officers and other causes; yet I do not think that the word "neglect" as used in said sec-

tion 138 is intended to make the sheriff an absolute insurer of the safety of a prisoner, or that an ordinary inadvertence or mistake of judgment was contemplated as a cause for impeachment. Infallibility was not expected by the framers of our Constitution, and perfection in any walk in life is unknown to the experience of mankind or to sacred and profane history, except in the single case of Him "who spake as never man spake" "let him who is guiltless cast the first stone." To hold that a sheriff must be impeached for a mere error of judgment or anything short of grave or serious neglect would render the Constitution of a free people despotic, tyrannical, and cruel.

We need not go elsewhere to get a definition of the word "neglect" as used in our Constitution, for this court in the case of *White v. State,* 123 Ala. 587, 26 South. 346, said: "We cannot doubt that the framers of the present Constitution used the words 'neglect of duty' in the sense and meaning which has been accorded to them by the courts, and, having been thus used, the Legislature cannot enlarge their scope and meaning." "To neglect is to omit by carelessness or design." —*New York Guaranty Co. v. Gleason,* 53 How. Prac. (N. Y.) 127. "Neglect means omission or forbearance to do a thing that can be done or that is required to be done."—16 Am. & Eng. Ency. Law, 385, and note 2. There must not only be a failure by carelessness or design to perform the duty required to be performed, but the party must have the capacity to perform the acts required of him, provided the incapacity is not superinduced by his fault or the result of his own misconduct. Here we have a clear definition of official neglect, as defined by our own court, and which must have been put in section 138 of the Constitution with the meaning and interpretation given it, inasmuch as there was no effort to define it otherwise by the instrument itself.

[State ex rel. Garber Attorney General v. Cazalas, Sheriff.]

I do not understand the majority of the court to hold that the respondent's misconduct was designed, but they seem to go upon the idea that his failure to resort to preventive measures was such a careless act as to render him guilty of such a neglect as is contemplated by section 138 of the Constitution. First, that the very nature of the crime, the popularity of the deceased, etc., was calculated to make a prudent man apprehensive that an attempt would be made to lynch the prisoner, Robertson; and, second, that Jas. H. Webb had warned him to expect an attempt to lynch the prisoner. Under the proof in the case, the first proposition must fall. The undisputed evidence shows that from the time of the shooting of Fotch and up to the very hour of the lynching there was no excitement, no congregation of the populace, and that the town was in its usual orderly and normal condition. Witnesses who had passed over every thoroughfare and byway, who visited nearly every popular place of business, testified without contradiction that there was nothing to indicate from the conduct and manner of the public that any violence would be attempted on the prisoner. These witnesses are fully sustained by the fact that the jail was not attacked. There was no mob, and the prisoner was slain by not exceeding a dozen midnight assassins who approached the jail stealthily, and, by twos and fours. Again, this respondent had encountered previous lynchings, and preceding them the town was wild with excitement, the streets were paraded, and indignation meetings were held. Compare the two, and it will be found that the respondent's past experience gave him every assurance that the conduct of the public on this occasion gave every indication that there would be no attempt to do violence to his prisoner. True, there were witnesses who heard rumors of a prob-

able lynching, that he ought to be lynched, etc., yet most of them admitted that they attached but little importance to said rumors. They had been in the city on former occasions, knew the temper of the people then, and compared it with the then quiet and orderly condition of the city. Not a single witness who heard said rumors attached enough importance to them to report to the sheriff, the mayor, or chief of police, but this respondent must be chargeable with rumors and conditions not deemed serious by a single man, save Jas. H. Webb, who only communicated his opinion to the sheriff incidentally. That Mr. Webb warned the defendant there can be no doubt. Whether or not respondent heard him there is very serious doubt. Mr. Webb told him in the presence of Judge Alford that Mrs. Hodgson, or the negro woman, had overheard a man say there was going to be a lynching. When Mr. Webb told this respondent what he had heard, Judge Alford and the respondent both expressed no fear, evidently based on the then serene and quiet condition of the city, and Mr. Webb did not then take issue with them, but merely remarked to respondent when they left Judge Alford's office that they were going to lynch that negro "as sure as gun is iron." Did the respondent hear him? His hearing is not good, and he says he did not or did not remember. Mr. Webb did not say that he did hear him, and they parted after this remark.

Conceding, however, that the respondent heard Jas. H. Webb, was it any more than his mere opinion based solely upon what his client or Mrs. Hodgson told him? On the other hand, Judge Alford, equally as familiar with conditions as Mr. Webb, expressed a different opinion, and the respondent entertained similar views. Mr. Webb's opinion was a mere conjecture, and

the opinion of Judge Alford was based upon existing and fortifying conditions. Again, not a single person other than Mr. Webb ever gave the respondent the slightest warning, and it looks unreasonable that if there was any foundation of "a lynching in the air," it would have sufficiently attracted the notice of some conservative and law-abiding citizen to the extent of causing him to impart his information to the sheriff, the mayor, or chief of police. Conceding, however, that this respondent was chargeable with notice that an attempt would be made to get his prisoner, what else could he have done? The majority concede that conditions were not such as to call for the military or an armed guard to surround the jail, but seem to charge his whole dereliction of duty to the fact that he did not instruct his guards to close the wooden doors and the second steel door to the guardroom. It was utterly impracticable to have closed the wooden doors, as other deputies were coming in with prisoners at all hours of the night. Had they been closed, one of the guards would have to open them and would put himself more accessible to would-be intruders than he was by remaining in the guardroom. As to the other steel door, its being shut would not have removed the guards from the reach of the men who covered them. On the other hand, with both doors of the cage closed, they would have been at a disadvantage as to egress in defending entrances or attacks in other parts of the building. Had they locked themselves so that it would have taken them too long to get out, and an attack had been made elsewhere, it might be said that the sheriff was guilty of neglect for not instructing them to keep the doors open so as to have ready access to other parts of the building. The jail was impregnable to a forcible attack, as the state proved this fact beyond question. The prisoner was

placed in the most secure cell in the building, and was gotten out only by some one who was doubtless familiar with the jail, and in a way which the sheriff had no reason to anticipate. When leaving for his home, he left five deputies on duty, two in the guardroom and two upstairs. He had every reason to believe that these five men could protect the prisoners in such a modern and well-constructed jail as the one in question. He had ever been faithful to his chief, and he had every reason to assume that his subordinates would be faithful to him, and could and would take care of the premises without any special instructions from him. Yet we find this man condemned and removed from a high office to which he had been elected because, sick though he was, he merely failed to tell his subordinates to close a certain door. It is always easy to see how a thing could have been prevented after it happens, but a failure to resort to certain preventive means is often a mere error of judgment. It has also been suggested that this man ought to be convicted because he retained the deputies and did not discharge them. In other words, had he condemned them and gotten rid of them, he would have shifted the blame from his own shoulders, and escaped. He said he investigated the matter, and was not satisfied that they were to blame. Like the brave man that he is, he gave his subordinates the benefit of the doubt, and did not shift the responsibility in order to make fair weather for himself.

This is in the nature of a criminal prosecution, and I think the facts fully generate a reasonable doubt as to whether or not this man has been guilty of impeachable conduct. I think this doubt exists from the evidence, regardless of the proof of his good character; but when it is considered with the very weak evidence of the state, much of which has been procured through paid

detectives, there can be but little doubt that this man is not guilty of impeachable conduct. The undisputed evidence shows that for 20 years he has been a brave and faithful officer—true to his post in most trying times. When but a deputy, he stood his ground and risked his life in defense of a negro rapist against an outraged and maddened mob. Some say he was standing by a brother deputy when he was killed, but Ex-sheriff Powers said he placed him in another position because he was the bravest and coolest man he had; yet we find a majority of the court convicting this man almost entirely because he did not accept Mr. Webb's opinion, which was not shared in by the respondent himself, Judge Alford, or any other witness who testified in the case, or by any other man in the city, for that matter, as we find no one informing the sheriff, mayor, or chief of police of any threatened danger, notwithstanding there is a law and order league in the city, and the members of which are presumed to have as high a regard for the preservation of human life as in ferreting out petty offenses or in the conviction of this unfortunate and feeble man. Lynchings are to be deplored, and have unfortunately been a blot upon modern civilization, and the majesty of the law should be upheld at all hazards, and the framers of the Constitution evidently prepared drastic means as to the sheriffs as a panacea for existing woes, and the removal of a sheriff may have a very salutary influence in the future, as was argued by counsel for the state, but an unjust removal of a man who has been elected to a high office by the people, doubtless due to the fact that he was a brave and efficient deputy, is to my mind a great injustice.

The Constitution has singled out sheriffs, and holds them to a high degree of accountability for slighter mis-

conduct than it does as to other officials. They are deprived of a right of trial by a jury of their peers—a right sacred to all English speaking people. The state has practically a change of venue, with every means of defraying the expenses of her witnesses. She has been aided by an organization and hired detectives. The respondent has been removed from his home and friends, has had to come nearly 200 miles to stand his trial and bring his witnesses at his own expense; yet with all these advantages in favor of the state we find this man convicted, bankrupted, and humiliated because he failed to act upon the opinion of one man and neglected to tell his deputies to close certain doors, customarily left open, before going home.

My Brothers, in their effort to charge respondent with neglect because of a failure to have certain outer wooden doors closed, cite section 132, Code 1907, which makes the sheriff the custodian of the courthouse and jail, and requires him to exclude intruders therefrom. While this is true, it must be borne in mind that his possession and control is subordinate to the orders and directions in a measure of the county commissioners or board of revenue.—*White v. Hewlett*, 143 Ala. 374, 42 South. 78. The basement door and the outer wooden doors were not openings to the jail alone, but to the building of which the jail proper was but a part, and which included offices which had been assigned by the proper authorities to various and sundry officials. The closing of these doors, therefore, would not only tend to exclude intruders, but would have excluded these officials from convenient ingress and egress to and from their respective places of business. Moreover, the sheriff had nothing to do with the basement door, as the basement had been put in the charge of the engineer by the board of revenue.

It is also suggested that the sheriff is, under the statute, the jailor of the county. This I do not combat, but I do not think that it means that he must be the actual keeper of the jail, as section 7191 of the Code authorizes him to appoint a jailer, and makes him civilly responsible for his acts. The sheriff in this instance had a jailer who was in full control and charge of the jail with two guards on duty and two deputies upstairs with the prisoners. There was not the slightest proof that this jailer was incompetent; yet the majority seem to think this man was guilty of a neglect because he did not instruct the jailer, who doubtless knew better how to look after and protect the jail than the sheriff. This court sits as a jury as well as judges, and in the consideration of facts should not lose sight of the human phase of the case. What may appear to them as neglect when measured with the exacting lines of their training and theory may be but an error of judgment upon the part of the average citizen who has had neither a judicial nor military training.

I dissent from the conclusion of the majority, and think that this respondent should be discharged.

MAYFIELD, J., concurs in the conclusion of ANDERSON, J.