# McMILLIAN $v.$ MONROE COUNTY, ALABAMA

No. 96–542.   Argued March 18, 1997—Decided June 2, 1997

*Bryan A. Stevenson* argued the cause for petitioner. With him on the briefs was *Robert B. McDuff.*

*Paul M. Smith* argued the cause for respondent. With him on the brief were *Donald B. Verrilli, Thomas J. Perrelli, James W. Webb, Kendrick E. Webb, Daryl L. Masters,* and *Bart Harmon.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Acting Solicitor General Dellinger, Acting Assistant Attorney General Pinzler, Deputy Solicitor General Waxman, Lisa Schiavo Blatt,* and *Miriam R. Eisenstein;* for the American Civil Liberties Union et al. by *Steven R. Shapiro, Paul C. Saunders, Marc L. Fleischaker, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Mitchell F. Dolin,* and *Robert A. Long, Jr.;* and for the Southern States Police Benevolent Association by *J. Michael McGuinness.*

Briefs of *amici curiae* urging affirmance were filed for Jefferson County, Alabama, by *Jeffrey M. Sewell* and *Charles S. Wagner;* and for the National Association of Counties et al. by *Richard Ruda* and *James I. Crowley.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner sued Monroe County, Alabama, under Rev. Stat. § 1979, 42 U. S. C. § 1983, for allegedly unconstitutional actions taken by Monroe County Sheriff Tom Tate. If the sheriff's actions constitute county "policy," then the county is liable for them. *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694 (1978). The parties agree that the sheriff is a "policymaker" for § 1983 purposes, but they disagree about whether he is a policymaker for Monroe County or for the State of Alabama. We hold that, as to the actions at issue here, Sheriff Tate represents the State of Alabama and is therefore not a county policymaker. We thus affirm the Court of Appeals' dismissal of petitioner's § 1983 claims against Monroe County.

## I

In November 1986, Ronda Morrison was murdered in Monroe County, a sparsely populated county located in southwest Alabama. Petitioner and one Ralph Myers were indicted for this crime. Myers then pleaded guilty to a lesser offense and testified against petitioner at his trial. A jury convicted petitioner of capital murder, and the trial court sentenced him to death. After two remands, the Alabama Court of Criminal Appeals reversed petitioner's conviction, holding that the State had violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), by suppressing statements from Myers that contradicted his trial testimony and other exculpatory evidence. *McMillian* v. *State*, 616 So. 2d 933, 942–948 (1993). Thus, after spending six years in prison, petitioner was released.

He then brought this § 1983 lawsuit in the District Court for the Middle District of Alabama against respondent Monroe County and numerous officials, including the three men in charge of investigating the Morrison murder—Tom Tate, the Sheriff of Monroe County; Larry Ikner, an investigator with the District Attorney's office in Monroe County; and Simon Benson, an investigator with the Alabama Bureau of

Investigation. Only two of the officials were sued in their official capacities—Sheriff Tate and investigator Ikner—and it is only these official-capacity suits that concern us here.[1] Petitioner principally alleged that Tate and Ikner, in their capacities as officials of Monroe County, not as officers of the State of Alabama, intimidated Myers into making false statements and suppressed exculpatory evidence. App. to Pet. for Cert. 26a–33a; *McMillian v. Johnson*, 878 F. Supp. 1473, 1486–1488 (MD Ala. 1995).

The District Court dismissed the claims against Monroe County and the claims against Tate and Ikner in their official capacities. The court held that "any unlawful acts of Defendants Tate and Ikner cannot be said to represent [Monroe] County's policy," because "an Alabama county has [no] authority to make policy in the area of law enforcement." App. to Pet. for Cert. 55a. Petitioner appealed the District Court's decision as to Sheriff Tate. The Court of Appeals for the Eleventh Circuit affirmed, agreeing with the District Court that "Sheriff Tate is not a final policymaker for Monroe County in the area of law enforcement, because Monroe County has no law enforcement authority." *McMillian v. Johnson*, 88 F. 3d 1573, 1583 (1996). We granted certiorari, 519 U. S. 1025 (1996), and now affirm.

## II

### A

We held in *Monell*, 436 U. S., at 694, that a local government is liable under § 1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Ibid.* A court's task is to

---

[1] The claims against the defendants in their individual capacities have proceeded independently in the lower courts, with some of petitioner's claims surviving motions for summary judgment. See *McMillian v. Johnson*, 878 F. Supp. 1473, 1544–1545 (MD Ala. 1995).

"identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett* v. *Dallas Independent School Dist.*, 491 U. S. 701, 737 (1989). Here, the parties agree that Sheriff Tate has "final policymaking authority" in the area of law enforcement. They sharply disagree, however, about whether Alabama sheriffs are policymakers for the State or for the county when they act in a law enforcement capacity.[2]

In deciding this dispute, our inquiry is guided by two principles. First, the question is not whether Sheriff Tate acts for Alabama or Monroe County in some categorical, "all or nothing" manner. Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue. See *ibid.* (court must identify "those officials who have the power to make official policy *on a particular issue*" (emphasis added)); *id.*, at 738 (question is whether school district superintendent "possessed final policymaking authority *in the area of* employee transfers" (emphasis added)); *St. Louis* v. *Praprotnik*, 485 U. S. 112, 123 (1988) (plurality opinion) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy *in that area of* the city's business"). Thus, we are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in. We simply ask whether Sheriff Tate repre-

---

[2] We have explained that a suit against a governmental officer "in his official capacity" is the same as a suit "'against [the] entity of which [the] officer is an agent,'" *Kentucky* v. *Graham*, 473 U. S. 159, 165 (1985) (quoting *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 690, n. 55 (1978)), and that victory in such an "official-capacity" suit "imposes liability on the entity that [the officer] represents," *Brandon* v. *Holt*, 469 U. S. 464, 471 (1985).

sents the State or the county when he acts in a law enforcement capacity.

Second, our inquiry is dependent on an analysis of state law. Cf. *Jett, supra*, at 737 ("'[W]hether a particular official has "final policymaking authority" is a question of *state law*'" (quoting, with original emphasis, *Praprotnik, supra*, at 123 (plurality opinion))); *Pembaur* v. *Cincinnati*, 475 U. S. 469, 483 (1986) (plurality opinion) (same). This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law. Cf. *Regents of Univ. of Cal.* v. *Doe*, 519 U. S. 425, 429, n. 5 (1997) ("[The] federal question can be answered only after considering the provisions of state law that define the agency's character").

B

The Court of Appeals for the Eleventh Circuit determined that under Alabama law, a sheriff acting in his law enforcement capacity is not a policymaker for the county. Since the jurisdiction of the Court of Appeals includes Alabama, we defer considerably to that court's expertise in interpreting Alabama law.[3] See *Jett, supra*, at 738 ("We think the Court of Appeals [for the Fifth Circuit], whose expertise in interpreting Texas law is greater than our own, is in a better position to determine whether [the school district superintendent] possessed final policymaking authority in the area of employee transfers"); *Pembaur, supra*, at 484, n. 13 ("We

---

[3] We note that two of the three judges on the Eleventh Circuit's panel are based in Alabama. In addition, this is the second Eleventh Circuit panel to have reached this conclusion. See *Swint* v. *Wadley*, 5 F. 3d 1435, 1450–1451 (1993), vacated for lack of appellate jurisdiction, 514 U. S. 35 (1995).

generally accord great deference to the interpretation and application of state law by the courts of appeals").

We begin with the Alabama Constitution, "the supreme law of the state." *Alexander* v. *State ex rel. Carver*, 150 So. 2d 204, 208 (Ala. 1963). We agree with the Court of Appeals that the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court strongly support Monroe County's contention that sheriffs represent the State, at least for some purposes. Alabama's Constitution, adopted in 1901, states that "[t]he executive department shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county." Ala. Const. of 1901, Art. V, § 112. This designation is especially important for our purposes, because although every Alabama Constitution has included sheriffs as constitutional officers and has provided for their election by county voters, see Ala. Const. of 1819, Art. IV, § 24; Ala. Const. of 1861, Art. IV, § 24; Ala. Const. of 1865, Art. VII, § 3; Ala. Const. of 1867, Art. V, § 21; Ala. Const. of 1875, Art. V, § 26; Ala. Const. of 1901, Art. V, § 138, sheriffs have not always been explicitly listed as members of the state "executive department." Thus, the 1867 Constitution listed only the "governor, lieutenant governor, secretary of state, auditor, treasurer, and attorney general" as constituting "the executive department." Ala. Const. of 1867, Art. V, § 1. This changed with the 1875 Constitution, when sheriffs and the superintendent of education were added to the list. Ala. Const. of 1875, Art. V, § 1.[4]

---

[4] Executive department officers have to take the constitutional oath of office, Ala. Const. of 1901, Art. XVII, § 279; Ala. Const. of 1875, Art. XV, § 1, and are required to submit written reports to the Governor on demand. Submitting a false report was originally a crime, Ala. Const. of 1875, Art. V, § 9, and is now an impeachable offense, Ala. Const. of 1901, Art. V, § 121.

The framers of the 1901 Constitution took two significant steps in an attempt to solidify the place of sheriffs in the executive department, and to clarify that sheriffs were acting for the State when exercising their law enforcement functions. First, faced with reports that sheriffs were allowing mobs to abduct prisoners and lynch them, the framers made such "neglect" by sheriffs an impeachable offense. See Ala. Const. of 1901, Art. V, § 138 ("Whenever any prisoner is taken from jail, or from the custody of any sheriff or his deputy, and put to death, or suffers grievous bodily harm, owing to the neglect, connivance, cowardice, or other grave fault of the sheriff, such sheriff may be impeached"); *State ex rel. Garber* v. *Cazalas*, 162 Ala. 210, 50 So. 296 (1909) (sheriff's failure to close jail doors, resulting in lynching of prisoner, constitutes impeachable offense); M. McMillan, Constitutional Development in Alabama, 1789–1901, p. 338, n. 186 (1955) (impeachment provision resulted in "much progress made against lynching").

Second, authority to impeach sheriffs was moved from the county courts to the State Supreme Court, because of "[t]he failure of county courts to punish sheriffs for neglect of duty." *Parker* v. *Amerson*, 519 So. 2d 442, 443 (Ala. 1987). One of the primary purposes of this change, proposed by ex-Governor Thomas Goode Jones at the 1901 Convention, was "to augment the power of the Governor." *Id.*, at 444. After this change, the Governor could order the State Supreme Court, rather than the county court, to begin impeachment proceedings against a wayward sheriff, and would not have to worry that local support for the sheriff would annul his effort at centralized control. See *ibid.*; Strengthening the Power of the Executive, Address of Emmet O'Neal, Governor of Alabama, pp. 9–10 (Sept. 12, 1911) (new impeachment provision increases Governor's control of sheriffs and "gives the Executive real power which is respected and feared"). Thus, sheriffs now share the same impeachment procedures as state legal officers and lower state court judges, Ala. Const. of 1901, Art. VII, § 174,

rather than county and municipal officers, Ala. Const. of 1875, Art. VII, § 3.

Critically for our case, the Alabama Supreme Court has interpreted these provisions and their historical background as evidence of "the framers' intent to ensure that sheriffs be considered executive officers of the state." *Parker*, 519 So. 2d, at 444. Based primarily on this understanding of the State Constitution, the court has held unequivocally that sheriffs are state officers, and that tort claims brought against sheriffs based on their official acts therefore constitute suits against the State, not suits against the sheriff's county. *Id.*, at 443–445.[5] Thus, Alabama counties are not liable under a theory of *respondeat superior* for a sheriff's official acts that are tortious. *Id.*, at 442. The issues in *Parker* are strikingly similar to the ones in the present case, and that decision is therefore strong evidence in favor of the Court of Appeals' conclusion that sheriffs act on behalf of the State, rather than the county, when acting in their law enforcement capacity.

Turning from the Alabama Constitution to the Alabama Code, the relevant provisions are less compelling, but still support the conclusion of the Court of Appeals to some extent. Section 36–22–3 of the code sets out a sheriff's duties. First, a sheriff must "attend upon" the state courts in his county, must "obey the lawful orders and directions" of those courts, and must "execute and return the process and orders" of any state court, even those outside his county. Ala. Code §§ 36–22–3(1), (2) (1991). Thus, judges (who are state officers, see Ala. Const. of 1901, Amdt. 328, § 6.01) may order

---

[5] As a result of this holding and the State Constitution's sovereign immunity provision, see Ala. Const. of 1901, Art. I, § 14 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity"), the Alabama Supreme Court has held that a sheriff is absolutely immune from all suits for damages based on his official acts. *Parker* v. *Amerson*, 519 So. 2d 442, 446 (Ala. 1987). See also *King* v. *Colbert County*, 620 So. 2d 623, 626 (Ala. 1993); *Boshell* v. *Walker County Sheriff*, 598 So. 2d 843, 844 (Ala. 1992); *Hereford* v. *Jefferson County*, 586 So. 2d 209, 210 (Ala. 1991).

the sheriff to take certain actions, even if the judge sits in a distant county. And under Ala. Code § 12–17–24 (1995), the presiding circuit judge "exercise[s] a general supervision" over the county sheriffs in his circuit,[6] just as if the sheriffs are normal "court [*i. e.*, state] employees," see § 12–17–1.

Second, the sheriff must give to the county treasurer a sworn written statement detailing the funds he has received for the county since his last statement, and must pay these funds to the treasurer. § 36–22–3(3). In contrast to the state judges, however, the county treasurer does not appear to have any statutory authority to direct the sheriff to take specific actions.

Third and most importantly, "[i]t shall be the duty of sheriffs in their respective counties, by themselves or deputies, to ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county." § 36–22–3(4). By this mandate, sheriffs are given complete authority to enforce the state criminal law in their counties. In contrast, the "powers and duties" of the counties themselves—creatures of the State who have only the powers granted to them by the State, *Alexander,* 150 So. 2d, at 206—do not include any provision in the area of law enforcement. Ala. Code § 11–3–11 (1989). Thus, the "governing body" of the counties—which in every Alabama county is the county commission, see *Calvert* v. *Cullman County Comm'n,* 669 So. 2d 119 (Ala. 1995) (citing § 11–1–5)—cannot instruct the sheriff how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime. And when the sheriff does secure such evidence, he has an obligation to share this information not with the county commission, but with the district attorney (a state official, see *Hooks* v. *Hitt,* 539 So. 2d 157, 159 (Ala. 1988)).

---

[6] Seventeen of the forty judicial circuits in Alabama contain more than one county, including the circuit in which Monroe County sits. Ala. Code § 12–11–2 (1995).

While the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the Governor and the attorney general do have this kind of control. Pursuant to § 36–22–5, they can direct the sheriff to investigate "any alleged violation of law in their counties." And after "proceed[ing] promptly" to complete this investigation, the sheriff must "promptly" write a report to the state official in charge of the investigation, stating his findings, listing the witnesses he has secured, and summarizing what the witnesses can prove. *Ibid.* In addition, the salaries of all sheriffs are set by the state legislature, not by the county commissions. § 36–22–16.

To all of this, petitioner counters with four important provisions that cut in favor of the conclusion that sheriffs are county officials. First, the sheriff's salary is paid "out of the county treasury." *Ibid.* Second, the county provides the sheriff with equipment (including cruisers), supplies, lodging, and reimbursement for expenses, to the extent "reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office." § 36–22–18. Third, the sheriff's jurisdiction is limited to the borders of his county. See, *e. g.,* § 36–22–3(4) ("It shall be the duty of sheriffs *in their respective counties* . . . to ferret out crime" (emphasis added)). Fourth, the sheriff is elected locally by the voters in his county (as he has been since Alabama's 1819 Constitution). See Ala. Const. of 1901, Art. V, § 138; Ala. Const. of 1819, Art. IV, § 24.

We do not find these provisions sufficient to tip the balance in favor of petitioner. The county's payment of the sheriff's salary does not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely. The county commissions do appear to have the discretion to deny funds to the sheriffs for their operations beyond what is "reasonably necessary." See *Etowah County Comm'n* v. *Hayes,* 569 So. 2d 397, 399 (Ala. 1990) *(per curiam).* But at most, this

discretion would allow the commission to exert an attenuated and indirect influence over the sheriff's operations.

Petitioner's contention that sheriffs are county officials because "state policymakers" typically make policy for the entire State (without limits on their jurisdiction) and are typically elected on a statewide (not local) basis, surely has some force. But district attorneys and state judges are often considered (and in Alabama are considered) state officials, even though they, too, have limited jurisdictions and are elected locally. These characteristics are therefore consistent with an understanding of the 67 Alabama sheriffs as state officials who have been locally placed throughout the State, with an element of control granted to the officials and residents of the county that receives the sheriff's services.[7]

---

[7] Petitioner also makes three other points that we believe have little merit. First, he points out that when the sheriff's office is vacant or when the sheriff is incapacitated, it is the county coroner that fills in for the sheriff. Ala. Code § 11-5-5 (1989). We note that this temporary assignment only lasts until the Governor appoints a replacement for the sheriff, who then serves out the remainder of the sheriff's term. Ala. Code § 36-9-17 (1991). Thus, even assuming that the county coroner is a county official, we place little weight on this assignment of temporary responsibility, which by its nature must fall to an official who is already in the county and available to step in for the sheriff at any time. Second, petitioner cites several instances in the code where a group of officials that includes the sheriff is designated a group of "county officials" or "county employees." See, e. g., §§ 36-3-4, 36-15-1, 36-22-16. But in light of the Alabama Supreme Court's conclusion that (i) sheriffs are state officials according to the State Constitution, see *Parker*, 519 So. 2d, at 443, and (ii) contrary statements in that court's prior decisions had ignored the Constitution and therefore should not be followed, *id.*, at 445 (citing, among other cases, *In re Opinions of Justices*, 225 Ala. 359, 143 So. 345 (1932)), we think that any contrary implication in the code is entitled to little weight. Finally, petitioner relies on the Monroe County Commission's insurance policy—which, according to the District Court, "may cover . . . some, but not all, of the claims made against" Monroe County and Sheriff Tate in this suit, App. to Pet. for Cert. 77a—to establish that the commission will pay any judgment rendered against Sheriff Tate. But this policy shows, at the most, that there was uncertainty as to whether the courts would con-

In sum, although there is some evidence in Alabama law that supports petitioner's argument, we think the weight of the evidence is strongly on the side of the conclusion reached by the Court of Appeals: Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties. Cf. *Praprotnik*, 485 U. S., at 125 ("We are not, of course, predicting that state law will always speak with perfect clarity"); *id.*, at 126–127 ("It may not be possible to draw an elegant line that will resolve this conundrum").

## C

Petitioner argues that this conclusion will create a lack of uniformity in Alabama and throughout the country. First, he argues that it is anomalous to have 67 different "state policymakers" in the person of Alabama's 67 county sheriffs, all of whom may have different "state law enforcement policies" in their counties. Second, he points out that most Federal Courts of Appeals have found county sheriffs to be county, not state, officials, and he implies that our affirmance of the Court of Appeals will either call those decisions into question or create an unacceptable patchwork of rulings as to § 1983 liability of counties for the acts of their sheriffs. We reject both arguments: The first ignores the history of sheriffs, and the second ignores our Nation's federal nature.

English sheriffs (or "shire-reeves") were the King's "reeves" (officers or agents) in the "shires" (counties), at least after the Norman Conquest in 1066. See C. Wigan & D. Meston, Mather on Sheriff and Execution Law 1–2 (1935). Although chosen locally by the shire's inhabitants, the sheriff did "all the king's business in the county," 1 W. Blackstone, Commentaries on the Laws of England 328 (1765), and was "the keeper of the king's peace," *id.*, at 332. See also Wigan & Meston, *supra*, at 2 ("It is this position of the Sher-

---

sider Sheriff Tate a county policymaker in these circumstances, not that the county would pay any judgment against him.

iff as the executive officer of the Crown which has all along been the outstanding characteristic of the office").

As the basic forms of English government were transplanted in our country, it also became the common understanding here that the sheriff, though limited in jurisdiction to his county and generally elected by county voters,[8] was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace. See, *e. g.,* Wager, Introduction, in County Government Across the Nation 5 (P. Wager ed. 1950) ("The office of sheriff has an unbroken lineage from the Anglo-Saxon *shire-reeve*"); 1 W. Anderson, A Treatise on the Law of Sheriffs, Coroners and Constables 5 (1941) ("In the exercise of executive and administrative functions, in conserving the public peace, in vindicating the law, and in preserving the rights of the government, he (the sheriff) represents the sovereignty of the State and he has no superior in his county"); R. Cooley, Handbook on the Law of Municipal Corporations 512 (1914) ("Sheriffs, coroners, clerks and other so-called county officers are properly state officers for the county. Their functions and duties pertain chiefly to the affairs of state in the county"); 3 J. Bouvier, Bouvier's Law Dictionary 3058 (8th ed. 1914) (defining sheriff as "[a] county officer representing the executive or administrative power of the state within his county").

This historical sketch indicates that the common law itself envisioned the possibility that state law enforcement "policies" might vary locally, as particular sheriffs adopted varying practices for arresting criminals or securing evidence.[9]

---

[8] See W. Murfree, A Treatise on the Law of Sheriffs and Other Ministerial Officers 6 (1890) (sheriffs elected by county voters in all States but two).

[9] Cf. *McMillian* v. *Johnson,* 88 F. 3d 1573, 1579 (CA11 1996) ("[W]e see no anomaly in having different state policymakers in different counties. Such a situation would be no different than if each of a city's police precinct commanders had unreviewable authority over how arrestees were processed. Each commander might have a different processing policy, but that does not render a commander's policy that of her precinct as opposed to that of the city when the city is sued under § 1983").

Thus, petitioner's disagreement with the concept that "county sheriffs" may actually be state officials is simply a disagreement with the ancient understanding of what it has meant to be a sheriff.

Petitioner's second concern is that under our holding here, sheriffs will be characterized differently in different States. But while it might be easier to decide cases arising under § 1983 and *Monell* if we insisted on a uniform, national characterization for all sheriffs, such a blunderbuss approach would ignore a crucial axiom of our government: the States have wide authority to set up their state and local governments as they wish. Understandably, then, the importance of counties and the nature of county government have varied historically from region to region, and from State to State. See, *e. g.*, Wager, *supra*, at 5–8 (describing different systems of rural government that developed in the Massachusetts, New York, Pennsylvania, and Virginia colonies, which later resulted in counties having widely varying roles in the four regions); Martin, American County Government, in County Governments in an Era of Change 3–5 (P. Berman ed. 1993) (same); DeSantis & Renner, Governing the County, *id.*, at 16–25 (describing varying levels of power currently exercised by counties in different States, and explaining how regional influences have resulted in different forms of county government in different States); *id.*, at 19 (listing Alabama as 37th among the 50 States in amount of discretionary authority granted to its counties). Thus, since it is entirely natural that both the role of sheriffs and the importance of counties vary from State to State, there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State, and not in another.[10]

---

[10] Compare, *e. g.*, *Strickler* v. *Waters*, 989 F. 2d 1375, 1390 (CA4 1993) (Virginia "city sheriff" does not set city policy in area of jail conditions); *Thompson* v. *Duke*, 882 F. 2d 1180, 1187 (CA7 1989) (Illinois sheriff does not set county policy in area of training jail employees, because county board of commissioners has no authority to set policy in this area), with *Dotson* v. *Chester*, 937 F. 2d 920, 926–928 (CA4 1991) (Maryland sheriff

The final concern of petitioner and his *amici* is that state and local governments will manipulate the titles of local officials in a blatant effort to shield the local governments from liability. But such efforts are already foreclosed by our decision in *Praprotnik*. See 485 U. S., at 127 (plurality opinion) ("[E]gregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded" by allowing plaintiffs to prove that "a widespread practice" has been established by "'custom or usage' with the force of law"). And there is certainly no evidence of such manipulation here; indeed, the Alabama provisions that cut most strongly against petitioner's position predate our decision in *Monell* by some time.

The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Petitioner Walter McMillian, convicted of capital murder, spent nearly six years on Alabama's Death Row. In 1993, the Alabama Court of Criminal Appeals determined that government officials, including the Sheriff of Monroe County, had concealed evidence of McMillian's innocence. Based on that evidence, the court overturned the conviction. The State thereafter dismissed all charges against McMillian and released him from prison.

---

sets county policy in area of jail conditions, based on exhaustive survey of Maryland law; citing no constitutional provision to the contrary); *Davis* v. *Mason County*, 927 F. 2d 1473, 1480 (CA9 1991) (Washington sheriff sets county policy in area of training deputy sheriffs, based on statutory provision labeling sheriff "chief executive officer . . . of the county"; citing no constitutional provision to the contrary (internal quotation marks omitted)); *Turner* v. *Upton County*, 915 F. 2d 133, 136–137 (CA5 1990) (Texas sheriff sets county policy in area of law enforcement, based on "unique structure of county government in Texas"; citing no constitutional provision to the contrary (internal quotation marks omitted)); *Crowder* v. *Sinyard*, 884 F. 2d 804, 828 (CA5 1989) (Arkansas sheriff sets county policy in area of law enforcement; citing no constitutional provision to the contrary).

Seeking redress for an arrest and years of incarceration in violation of his federal constitutional rights, McMillian commenced the instant action under 42 U. S. C. § 1983. He named as defendants both Monroe County and the County's Sheriff, Tom Tate. McMillian alleged that Sheriff Tate withheld exculpatory evidence, generated false, inculpatory evidence, and subjected him to gross racial insults and relentless intimidation.

Sheriff Tate, it is uncontested, has "final policymaking authority" under Alabama law over matters of law enforcement in Monroe County. Our precedent instructs that, if the sheriff makes policy for the State, Monroe County would not be accountable, under § 1983, for that policy; if, on the other hand, the sheriff acts as law enforcement policymaker for Monroe County, then the county would be answerable under § 1983. See *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694 (1978).

Alabama has 67 county sheriffs, each elected, paid, and equipped locally, each with countywide, not statewide, authority. Unlike judges who work within the State's judicial hierarchy, or prosecutors who belong to a prosecutorial corps superintended by the State's Attorney General, sheriffs are not part of a state command and serve under no "State Sheriff General." The Court, nonetheless, holds that the policies set by Sheriff Tate in Monroe County, though discrete from, and uncoordinated with, the policies of sheriffs in other counties, "may fairly be said to represent [Alabama] policy." See *ibid.* I disagree.

I

In my view, Alabama law defining the office of sheriff indicates that the sheriff acts within and for the county when setting and implementing law enforcement policy.[1] In ex-

---

[1] The Court observes that this Court must "defer considerably" to the Eleventh Circuit's construction of Alabama law. See *ante*, at 786. But cf. *Salve Regina College* v. *Russell*, 499 U. S. 225, 231 (1991) (courts of appeals review *de novo* district courts' state-law determinations). Deference, however, does not supplant careful review, see *St. Louis* v. *Praprot-*

plaining why it concludes otherwise and deems the sheriff the State's, not the county's, policymaker, the Court leans heavily on provisions of the State's Constitution. The Court relies on the Alabama Constitution's designation of "a sheriff for each county" as a member of the State's "executive department." See Ala. Const., Art. V, § 112; *ante*, at 787. In addition, the Court points to two 1901 amendments relating to the impeachment of sheriffs. See *ante*, at 788–789. These measures are the strongest supports for the Court's classification of county sheriffs as state actors. They are not sturdy enough, however, to justify the Court's holding that county sheriffs are state officials.

Alabama law does not consistently designate sheriffs as "executive department" officers; instead, Alabama law in several instances refers to sheriffs as county officials. See *In re Opinions of Justices*, 225 Ala. 359, 143 So. 345 (1932) (sheriffs are county officers for purposes of 1912 constitutional amendment regarding county officers' salaries); Ala. Code § 36–3–4(a) (1991) (sheriff, a "county officer," shall be elected to four-year term); Ala. Code § 36–22–16(a) (1991) (sheriffs shall be compensated out of the county treasury in same manner as "other county employees"). Moreover, designations Alabama attaches to sheriffs in its laws and decisions are not dispositive of a court's assessment of Sheriff Tate's status for § 1983 purposes. Cf. *Regents of Univ. of Cal.* v. *Doe*, 519 U. S. 425, 429, n. 5 (1997); *Howlett* v. *Rose*, 496 U. S. 356, 376 (1990) (defenses to § 1983 actions are questions of federal law); *Martinez* v. *California*, 444 U. S. 277, 284, and n. 8 (1980) (state law granting immunity to parole officers does not control question whether such officers have immunity under § 1983). If a State's designation sufficed to answer the federal question at issue, "States would then be

_____

*nik*, 485 U. S. 112, 129–130, 131–132 (1988) (plurality opinion) (reversing Court of Appeals determination that certain city officials were municipal policymakers), and, in any event, has little place here because the Court's reasoning differs substantially from that of the Eleventh Circuit.

free to nullify for their own people the legislative decisions that Congress has made on behalf of all the People." *Howlett*, 496 U. S., at 383.

Nor are the 1901 impeachment measures secure indicators that a sheriff acts on behalf of the State, not the county. As the Court explains, the impeachment amendments were intended to provide a state check on county sheriffs in view of their glaring lapses in acquiescing to abductions and lynchings in the late 1800's. See *ante*, at 788. However, making an officer eligible for impeachment, by itself, does not change the governmental unit to which the officer belongs. See Ala. Const., Art. VII, § 175 (listing numerous county officials subject to impeachment); Ala. Code § 36–11–1(a) (1991) (same). And transferring impeachment proceedings from county courts to the State Supreme Court, see Ala. Const., Art. VII, § 174, is sensibly seen as an acknowledgment of the power wielded by sheriffs within their own counties, and the consequent need for placement of removal authority outside a sheriff's bailiwick. Furthermore, impeachment of sheriffs is not a power reserved exclusively to state officials; "five resident taxpayers" of the sheriff's county can initiate an impeachment. See Ala. Code § 36–11–6 (1991). Impeachment, in sum, provides an ultimate check on flagrant behavior, but does not serve as a tight control rein.

The prime controllers of a sheriff's service are the county residents, the people who select their sheriff at quadrennial elections. Sheriff Tate owes his position as chief law enforcement officer of Monroe County to the county residents who elected him, and who can unseat him. See Ala. Const., Art. V, § 138, as amended by Amdt. No. 35 ("A sheriff shall be elected in each county by the qualified electors thereof . . . ."). On the ballot, candidates for the office of sheriff are grouped with candidates for other county offices, and are not listed with state office candidates. See Ala. Code § 17–8–5 (1995).

Traditionally, Alabama sheriffs have had autonomy to formulate and execute law enforcement policy within the geographic confines of their counties. Under Alabama law, "[i]t shall be the duty of sheriffs *in their respective counties* . . . to ferret out crime, to apprehend and arrest criminals and . . . to secure evidence of crimes." Ala. Code § 36–22–3(4) (1991) (emphasis added); see also Ala. Code § 15–6–1 (1995) ("The sheriff is the principal conservator of the peace *in his county*, and it is his duty to suppress riots, unlawful assemblies and affrays. In the execution of such duty, he may summon to his aid as many of the men of his county as he thinks proper." (emphasis added)); § 15–10–1 (sheriffs may make arrests "within their respective counties").

Monroe County pays Sheriff Tate's salary, see Ala. Code § 36–22–16(a) (1991) (sheriffs shall be paid "out of the county treasury as the salaries of other county employees are paid"), and the sheriff operates out of an office provided, furnished, and equipped by the county, see § 36–22–18. The obligation to fully equip the sheriff is substantial, requiring a county commission to "furnish the sheriff with the necessary quarters, books, stationery, office equipment, supplies, postage and other conveniences and equipment, including automobiles and necessary repairs, maintenance and all expenses incidental thereto." *Ibid.* These obligations are of practical importance, for they mean that purse strings can be pulled at the county level; a county is obliged to provide a sheriff only what is *"reasonably needed* for the proper and efficient conduct of the affairs of the sheriff's office," *ibid.* (emphasis added). How generously the sheriff will be equipped is likely to influence that officer's day-to-day conduct to a greater extent than the remote prospect of impeachment. See *ibid.;* see also *Geneva Cty. Comm'n* v. *Tice,* 578 So. 2d 1070, 1075 (Ala. 1991) (county may reasonably limit budget for overtime pay for sheriff's deputies); Ala. Code § 36–22–16(a) (1991) (sheriff's salary, paid by county, may be

increased "by law by general or local act"); § 36–22–3(3) (sheriff must render to county treasurer a periodic written statement of moneys collected by sheriff on behalf of county).

Sheriff Tate, in short, is in vital respects a county official. Indeed, one would be hard pressed to think of a single official who more completely represents the exercise of significant power within a county. See *Pembaur* v. *Cincinnati*, 746 F. 2d 337, 340–341 (CA6 1984) (sheriff elected by residents of county to be county's chief law enforcement officer, paid and equipped by county, is "obvious[ly]" a county official), rev'd on other grounds, 475 U. S. 469 (1986).[2]

The Court observes that it is "most importan[t]" to its holding that Alabama sheriffs "are given complete authority to enforce the state criminal law in their counties." See *ante*, at 790. If the Court means to suggest that Sheriff Tate should be classified as a state actor because he is enforcing *state* (as opposed to county or municipal) law, the Court proves far too much. Because most criminal laws are of statewide application, relying on whose law the sheriff enforces yields an all-state categorization of sheriffs, despite the Court's recognition that such blanket classification is inappropriate. See *ante*, at 786. Sheriffs in Arkansas, Texas, and Washington, just like sheriffs in Alabama, enforce

---

[2] The majority of Courts of Appeals to have addressed this question have similarly concluded that sheriffs, when engaged in a variety of activities, are county actors. See, *e. g.,* cases cited *ante,* at 795–796, n. 10; see also *Parker* v. *Williams,* 862 F. 2d 1471, 1477–1481 (CA11 1989) (Alabama sheriff acts for county in hiring chief jailor); *Lucas* v. *O'Loughlin,* 831 F. 2d 232, 234–235 (CA11 1987) (Florida sheriff acts for county in hiring and firing deputies); *Weber* v. *Dell,* 804 F. 2d 796, 802–803 (CA2 1986) (New York sheriff acts for county in setting county jail strip search policy); *Marchese* v. *Lucas,* 758 F. 2d 181, 188–189 (CA6 1985) (Michigan sheriff acts for county in training deputies and ratifying deputies' use of force); *Blackburn* v. *Snow,* 771 F. 2d 556, 571 (CA1 1985) (Massachusetts sheriff acts for county in setting county jail strip search policy). But see *Soderbeck* v. *Burnett,* 821 F. 2d 446, 451–452 (CA7 1987) (Wisconsin sheriff acts on behalf of State, not county, in hiring and firing employees).

the State's law, but that does not make them policymakers for the State rather than the county. See *ante*, at 795–796, n. 10.

In emphasizing that the Monroe County Commission cannot instruct Sheriff Tate how to accomplish his law enforcement mission, see *ante*, at 790, the Court indirectly endorses the Eleventh Circuit's reasoning: Because under Alabama law a county commission does not possess law enforcement authority, a sheriff's law enforcement activities cannot represent county policy. See *McMillian* v. *Johnson*, 88 F. 3d 1573, 1578 (CA11 1996). There is an irony in this approach: If a county commission lacks law enforcement authority, then the sheriff becomes a state official; but if a county commission possesses such authority and directs the sheriff's activities, then the sheriff presumably would not be a *final* policymaker in the realm of law enforcement, see *St. Louis* v. *Praprotnik*, 485 U. S. 112, 127 (1988) (plurality opinion).

Moreover, in determining who makes county policy, this Court has never reasoned that all policymaking authority must be vested in a single body that either exercises that power or formally delegates it to another. Few local governments would fit that rigid model. Cf. *id.*, at 124–125 ("The States have extremely wide latitude in determining the form that local government takes . . . . [O]ne may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies."). Nor does *Monell* support such a constricted view of the exercise of municipal authority; there, we spoke of § 1983 liability for acts by "lawmakers *or* by those whose edicts or acts may fairly be said to represent official policy." 436 U. S., at 694 (emphasis added). In this case, Sheriff Tate is "the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Turner* v. *Upton Cty.*, 915 F. 2d 133, 136 (CA5 1990); see also *Blackburn* v. *Snow*, 771 F. 2d 556, 571 (CA1 1985); accord, *Vera* v. *Tue*, 73

F. 3d 604, 609 (CA5 1996) ("[T]he Sheriff, an elected county official [in Texas], had equal authority to the county commissioners in that jurisdiction [so] that his actions constituted those of the county just as much as those of the commissioners."). An Alabama sheriff is a county policymaker because he independently exercises law enforcement authority for the county. In this most crucial respect, the Alabama arrangement resembles the "unique structure of county government" in Texas. See *Turner*, 915 F. 2d, at 136–137, cited *ante*, at 796, n. 10.

The Court also suggests that because the Governor can direct a sheriff to investigate a violation of law in the county, an Alabama sheriff must be a state, not a county, official. See *ante*, at 791 (citing Ala. Code § 36–22–5 (1991)). It is worth noting that a group of county citizens can likewise trigger an investigation by the sheriff. See § 36–22–6(b). The respondent, Monroe County, did not inform us whether the Governor directs county sheriffs to conduct investigations with any regularity. More important, there is no suggestion that Sheriff Tate was proceeding under the Governor's direction when Tate pursued the investigation that led to McMillian's Death Row confinement. If Sheriff Tate were acting on instruction from the Governor, this would be a very different case. But the bare possibility that a Governor might sometime direct a sheriff's law enforcement activities does not lessen the sheriff's authority, as the final county policymaker, in the general run of investigations the sheriff undertakes.

## II

The Court's reliance on "the ancient understanding of what it has meant to be a sheriff," *ante*, at 795, is no more persuasive than its interpretation of Alabama law. This emphasis on the historical understanding of the office of sheriff implies, again, an all-state categorization of sheriffs throughout the Nation; but because the Court expressly disclaims such a "blunderbuss" approach, *ibid.*, that cannot be what

this history lesson is intended to convey. In England, it is true, the sheriff did perform "the king's business in the county." 1 W. Blackstone, Commentaries *339. But the English sheriff, as Blackstone described him, was far closer to the crown than his contemporary counterpart is to the central state government. While sheriffs were for a time chosen locally, "[t]his election," according to Blackstone, "was in all probability not absolutely vested in the [inhabitants of the counties], but required the royal approbation." *Id.*, at *340. Eventually, the king chose the sheriff from a list proposed by the judges and other great officers. See *id.*, at *340–*341.

Whatever English history may teach, "[t]hroughout U. S. history, the sheriff has remained the principal law enforcement officer in the county." G. Felkenes, The Criminal Justice System: Its Functions and Personnel 53 (1973); see *id.*, at 52–53 (referring specifically to Alabama sheriffs). In the United States, "[i]n order to reserve control over the sheriff's department and its police functions, the people made the sheriff an elective officer." *Id.*, at 53. It is this status as the county's law enforcement officer chosen by the county's residents that is at the root of the contemporary understanding of the sheriff as a county officer.

\* \* \*

A sheriff locally elected, paid, and equipped, who autonomously sets and implements law enforcement policies operative within the geographic confines of a county, is ordinarily just what he seems to be: a county official. Nothing in Alabama law warrants a different conclusion. It makes scant sense to treat sheriffs' activities differently based on the presence or absence of state constitutional provisions of the limited kind Alabama has adopted.

The Court's Alabama-specific approach, however, assures that today's immediate holding is of limited reach. The Court does not appear to question that an Alabama sheriff may still be a county policymaker for some purposes, such

as hiring the county's chief jailor, see *Parker* v. *Williams,* 862 F. 2d 1471, 1477–1481 (CA11 1989). And, as the Court acknowledges, under its approach sheriffs may be policymakers for certain purposes in some States and not in others. See *ante,* at 795, and n. 10. The Court's opinion does not call into question the numerous Court of Appeals decisions, some of them decades old, ranking sheriffs as county, not state, policymakers. Furthermore, the Court's recognition of the historic reasons why Alabama listed sheriffs as members of the State's "executive department," see *ante,* at 788–789, should discourage endeavors to insulate counties and municipalities from *Monell* liability by change-the-label devices. Thus, the Court's opinion, while in my view misguided, does little to alter § 1983 county and municipal liability in most jurisdictions.